[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 111 
George Burnham and Herbert E. Anthony were coexecutors under the will of Willard Whitney, who died about January 1, 1923, leaving a large estate. In due course, the estate was distributed in accordance with the terms of the will to Burnham and Anthony, as trustees. Each of said trustees gave a separate bond for the faithful discharge of his duties in the sum of $188,000, each bond being executed by the National Surety Company, as surety. During the lifetime of Whitney, both Burnham and Anthony had assisted him in looking after his affairs and properties, Burnham looking after the management of his real properties and Anthony attending to other matters. After the death of Whitney this arrangement seems to have been largely continued, Burnham managing and selling the real properties and turning the proceeds over to Anthony for deposit in the bank account kept by the trustees, and Anthony handling the other securities. Prior to the death of Whitney, Anthony was vice-president and general manager of the Merchants National Bank, in which Whitney kept his bank deposit and in which he deposited his securities. The executors and trustees continued to use this bank and its successors, as such depositary. Anthony was manager of this bank until 1924, when it was taken over by the Bank of Italy and operated as a separate branch, with him as vice-president and manager, until November, 1929, when that branch was consolidated into the main San Diego office of the Bank of Italy. Burnham was vice-president *Page 112 
and employee of the Southern Trust Commerce Bank of San Diego up to 1927, when this bank was taken over by the Bank of Italy and conducted as a separate branch, and thereafter remained with that bank until it also was consolidated into the main office of the Bank of Italy in San Diego in November, 1929, after which he continued as a vice-president and employee of this consolidated bank.
Between 1925 and 1929 Burnham and Anthony filed with the court five joint accounts as trustees of this estate, which accounts were respectively approved by the court. The last of these was filed on August 5, 1929. Shortly after consolidation of these two branches of the Bank of Italy, about November 23, 1929, it was discovered that while manager of the Merchants National Bank, both before and after it was taken over by the Bank of Italy, Anthony had committed heavy defalcations from that bank. Upon the advice of his attorney, Burnham immediately employed a firm of accountants to make a complete audit of the affairs of the estate and of the trust estate, from the death of Whitney, for the purpose of finding out whether or not Anthony had misused any of the estate funds. Prior to that time Burnham had had no suspicion as to any lack of integrity upon the part of Anthony. This audit revealed that there was an actual cash shortage in the amount reported as being on deposit in Anthony's bank at the time the estate was distributed to the trustees, and also at the time each subsequent report was filed and approved by the court. It also revealed that Anthony had collected certain sums without depositing them in the bank account of the estate, and that he had also furnished the information for reports to the court showing that he had received certain sums as interest and dividends which he had not received, due to the fact that he had sold and appropriated the proceeds of the corresponding securities. The audit showed an aggregate shortage in the estate of $36,851.70. On receiving this audit Burnham obtained an order of the court suspending Anthony from his trusteeship. Subsequently he filed his separate sixth account and obtained a citation for Anthony to make his separate report on that account. Such an account was filed by Anthony, which confirmed and admitted every item of his misappropriations as revealed by the audit and as *Page 113 
shown by Burnham's sixth account. All interested parties were represented at the hearing of these accounts and on March 25, 1930, the accounts were approved by the court and the decree and order approving the same was accepted by all parties and has become final. At the same time, Anthony was removed as a trustee of said estate and the Security Trust and Savings Bank of San Diego was appointed as one of said trustees, in his place. Shortly thereafter, the Bank of America, formerly the Bank of Italy, paid into the trust estate the sum of $24,828.72, which represented that portion of the shortage of Anthony in the trust funds which occurred through Anthony's manipulation of the books of the bank. About the same time, the National Surety Company paid into the trust estate $13,518.39, covering those portions of Anthony's existing shortage not covered by the first item referred to. Both of these items included interest as found due by the court in the order settling the sixth account.
By the will of Whitney both Burnham and Anthony were given a certain interest in the estate as recompense for their services as executors and as trustees. On December 31, 1929, Anthony assigned to the Bank of Italy his said interest in the estate and on April 4, 1930, this interest was assigned by the Bank of Italy to the National Surety Company, notice of these assignments being filed in the estate. On April 28, 1930, Burnham and the Security Trust and Savings Bank, as cotrustees, filed in the superior court a seventh account and report with a petition for partial distribution. On May 21, 1930, the National Surety Company filed a petition asking to be subrogated to the right of Burnham in and to the share of the estate given to him in the will of Whitney as compensation for his services as executor and trustee, to the extent of one-half of the $13,518.39 it had paid following the order of the court approving and settling the sixth account. After answers filed, the account and petitions were heard together. In addition to the other facts stated, evidence was received to the effect that Burnham had made no effort to audit or verify the figures furnished him by Anthony and set forth in the several accounts previously filed by the trustees or to familiarize himself with the records kept by Anthony, other than in a general way; that during the *Page 114 
period of the trusteeship he had never obtained from the bank in which the funds were deposited and of which Anthony was manager, a statement in connection with the account of the trust estate; that he had not examined the books of that bank in reference to that account; that as the various accounts were filed, Anthony gave to Burnham canceled checks evidencing the disbursements set forth therein, which checks were filed in court with the accounts; and that while these checks were serially numbered, some of the numbers were missing, in which cases Anthony had noted on the corresponding check stub an explanation therefor. The court filed its decision on September 25, 1930, and a supplemental decree settling the seventh account and ordering partial distribution on October 2, 1930. From various portions of this order and decree separate appeals have been taken by Burnham as trustee and individually, and by the National Surety Company, respectively.
[1] The first point, raised by the National Surety Company, is that the court erred in denying its petition for subrogation as to the beneficial interest of Burnham in the trust estate, to the extent of the amount of the payment claimed to have been made by them upon his bond and in his behalf. In this connection, it will be remembered that this company is the surety both on the bond of Burnham and on the bond of Anthony. Evidence was introduced at the hearing to the effect that when this company reimbursed the trust estate in the sum of $13,518.39, it placed upon the check by which payment was made, the number of each of these bonds. There was also evidence that upon its own books it charged one-half of the payment as made on the Burnham bond and the other half as made on the Anthony bond. Its present contention is that one-half of the payment made by it to reimburse the trust estate was made on account of its liability on Burnham's bond; that the order settling the sixth account has become final; that by this order it was settled that Burnham and Anthony were equally liable for all of the shortage; that in a spirit of fairness it accepted the court's ruling; that one-half of the amount paid was by it paid upon the liability of Burnham thus fixed by the order of the court; and that having paid this amount because of its liability upon Burnham's bond it is entitled, by sections 2848 and 2849 of the Civil Code, to be *Page 115 
subrogated to Burnham's interest in the estate to the extent of the payment thus made in his behalf. While this appellant concedes that Anthony could not recover any portion of the loss from Burnham, it contends that, having paid as surety for Burnham, it is entitled to so recover under the code sections named. It is argued that while prior to the order settling the sixth account there might have been a primary and secondary liability as between Anthony and Burnham, and while the court could have separately settled the respective accounts of Burnham and Anthony and charged the full amount of the defalcation against Anthony and relieved Burnham from liability, the court has not done so, but has finally fixed an equal responsibility upon Burnham and Anthony, so that the beneficiaries of the estate could hold either one of them responsible for the loss, and therefore, under section 2848, this surety has the same right as the beneficiaries and may proceed against its principal. The company argues that it thus paid an obligation on the part of Burnham which was fastened upon him by the court because of his negligence, and then states that in view of this final adjudication of the joint liability of Burnham and Anthony, it was not for them to question the order but in common honesty they accepted the decision and paid one-half of the amount for each of the trustees. An interesting speculation would be whether this company would take this same position had they been surety on Burnham's bond alone, with other sureties upon the bond of Anthony.
The portion of the order settling the sixth account, upon which this appellant bases its claim for subrogation, reads as follows:
"And the court upon the evidence heard and the stipulation made before the court by counsel for all of the parties appearing, finds that on and including March 4, 1930, the amount of cash of said trust estate with which said trustees George Burnham and Herbert E. Anthony are charged is the principal sum of $52,965.24.
"The court further finds that of this sum Herbert E. Anthony secretly and unlawfully, and without notice to or any knowledge of his co-trustee George Burnham, diverted and misappropriated to his own use the sum of $36,851.70; and that there is lawfully chargeable interest on $31,413.10 *Page 116 
of said principal sum so misappropriated at the rate of 7% per annum from August 1, 1929, to this date, March 24, 1930, the sum of $1423.17; but without prejudice to any legal or equitable right between said George Burnham and said Herbert E. Anthony in the premises."
As we read this order it does not fix an equal responsibility on Burnham by reason of any negligence on his part. While reliance is placed upon the statement in the order that both trustees "are charged" with $52,965.24, this appellant did not of course pay this amount which was chargeable to both trustees, but on the other hand paid a portion of the other amount mentioned in the second paragraph as misappropriated by Anthony without the knowledge of Burnham. Both trustees were chargeable with the full amount of cash that had been received, by the general law governing trustees, in the absence of circumstances relieving either from responsibility. This order did not fix that liability but merely fixed the amount which had been received and with which they were charged. After fixing this amount the order proceeds to find there was a shortage which existed by reason of the defalcation of Anthony, and concludes with the statement that this finding is without prejudice to any legal or equitable right between Burnham and Anthony. While the order thus finds that both trustees are chargeable with the full amount, as they always were so far as the estate and the beneficiaries are concerned, it does not find that the two trustees are equally liable as between themselves, but specifically excepts any such holding from the force of the order. What effect did this order then have upon Burnham and his surety? In the ordinary case, the finding that a trustee is chargeable with a specific amount, that is the full amount received, does not necessarily mean that his surety must pay that amount. If chargeable to the trustee, and not produced, his surety may become liable. If there are two trustees and two separate bonds, one trustee and his surety may be liable for a shortage while the other is not. Or in such a case where one trustee is in default, the other trustee may also be held liable by reason of his own negligence. In this case, the court did not hold that Burnham was negligent, the only finding being that while both are charged (so far as the estate is concerned) with the full amount, a shortage existed by reason of the *Page 117 
defalcation of one, unknown to the other. The effect of this order, with its "without prejudice" clause, is to impose a primary obligation and liability upon Anthony, the trustee in default. This is exactly what this appellant says the court could have done. And in accepting this order and paying a portion of the shortage, it must be held that this appellant was not paying the amount charged to Burnham by this order but was paying a part of the amount found by the order to be short by reason of the defalcation of Anthony alone, or in other words upon the obligation and liability imposed upon Anthony.
[2] We think this order established that a shortage existed due to the defalcation of Anthony and fixed the liability on him to that extent. This liability is something different and in addition to the general liability resting upon Anthony, equally with Burnham, to account to the estate for the full amount received. The order fixed a definite amount as taken by Anthony, and an obligation and liability upon him to return that amount follows, without a specific order from the court to that effect. This obligation also rested upon his surety and this company, in paying a portion thereof, must be held to have paid the same on account of this special obligation and liability of Anthony and not on account of the general liability of Burnham and Anthony to the beneficiaries. Unquestionably the amount was paid to cover this particular shortage of Anthony. As between the trustees Burnham was entitled to have the shortage made up by or for Anthony, rather than himself being liable for one-half thereof. Nor is the fact that Burnham was chargeable with the entire estate inconsistent with the fact that he was not primarily liable for this particular shortage. This appellant concedes that this is true, but contends that the wording of this particular order of the court has settled the matter otherwise and fixed a definite obligation upon Burnham which they, as his surety, then paid. With this contention we cannot agree.
While section 2848 of the Civil Code provides that a surety, upon satisfying the obligation of his principal, is entitled to be subrogated to that extent to all remedies which the creditor has against the principal, the question whether the obligation which is satisfied is in fact the obligation of the particular principal is to be decided in *Page 118 
accordance with the rules of law and principles of equity. As was said in Southern Surety Co. v. Tessum, 178 Minn. 495 [66 A.L.R. 1136, 228 N.W. 326, 329]: "Subrogation is equity's method of compelling the ultimate payment by the one who in justice and good conscience ought to make it — of putting the charge where it justly belongs. Emmert v. Thompson, 49 Minn. 386 [52 N.W. 31, 32 Am. St. Rep. 566]. It is not an absolute right, but depends upon the superiority of the equities of him who asserts it over those of the one against whom it is sought. `It will never be enforced when the equities are equal or the rights not clear.'"
In that case, in which a surety who had made good the default of one trustee sought to recover from a cotrustee, the court said:
"The next question is whether plaintiff may recover from Oluf Tessum and his sureties through subrogation. The argument is that the judgment creditors paid by plaintiff, had such payment not been made, could have recovered from Oluf and his sureties, and that plaintiff should now recover as a subrogee of that right. On that theory judgment was ordered for the full amount of plaintiff's payment against Oluf Tessum.
"The general rule is that an executor, administrator, or guardian is not liable for a devastavit committed by his cotrustee. Peter v. Beverly, 10 Pet. 532 [9 L.Ed. 522];State v. Wyant, 67 Ind. 25; 24 C.J. 1189; 11 R.C.L. 409. It is equally the law that by negligent inattention to his duties, by delinquency therein far short of active participation in the conversion of trust funds by a co-guardian, a guardian may render himself liable. Cheever v. Ellis, 144 Mich. 477
[108 N.W. 390], annotated 11 L.R.A. (N.S.) 296; 11 R.C.L. 410; 24 C.J. 1191, 1192; 28 C.J. 1282. Those rules deal with the liability of trustees to beneficiary. A very different question may arise when we come to the rights or liabilities of trustees between themselves. It is settled law that `though, as respects the remedy of the cestui que trust, each trustee is individually responsible for the whole amount of the loss, whether he was principal in the breach of trust, or was merely a consenting party, yet, as between the trustees themselves, the loss may be thrown upon the party on whom, as the recipient of the *Page 119 
money or otherwise, the responsibility ought in equity to fall'."
In the case before us, the primary and principal obligation was upon Anthony (In re Sanderson, 74 Cal. 199 [15 P. 753]). The order settling the sixth account, above quoted, and which is relied on as having changed this situation and finally and forever fixed the responsibility equally upon both trustees, in truth and in fact, was dealing with the default of Anthony and fixed the primary obligation upon him and only incidentally referred to the ultimate liability of both trustees as generally chargeable with the entire estate. This appellant now seeks to rely on the incidental part of the order only, applying thereto the strict letter of the statute without regard to the rules of equity applicable to the situation. That there is a difference between such a case as that before us and one involving the general responsibility of a trustee to the estate itself, was pointed out in American Bonding Co. v. Richardson, 214 Fed. 897, as follows: "This suit is not brought by the beneficiaries of the trust, nor by anyone in their behalf or in privity with them. On the contrary, the surety for hire upon the separate bond of a defaulting trustee is seeking to recover for itself from a cotrustee, who has been guilty of no active wrongdoing, the amount of the defalcation upon the sole ground that the honest trustee did not prevent the malfeasances of the dishonest one. This fact alone is sufficient to distinguish the present case from Caldwell v. Graham, 115 Md. 122 [38 L.R.A. (N.S.) 1029,80 A. 839]; In re Beatty's Estate, 214 Pa. 449 [63 A. 975];Bermington v. Wilcox, 120 Cal. 467 [52 P. 822], and similar cases upon which counsel for plaintiff place their chief reliance."
While Burnham was chargeable with the entire estate and must account therefor, he was not liable for this default of Anthony even to the beneficiaries, unless he became so by reason of his own negligence. Neither in the order here appealed from nor in the order settling the sixth account, which is relied upon by appellant as fixing the liability of Burnham, is any negligence on the part of Burnham found by the court, nor is such negligence to be implied from the findings made. Appellant largely relies upon certain evidence in the record to the effect that Burnham accepted figures, reports and statements furnished him by *Page 120 
Anthony and did not personally examine the original records and accounts, as establishing negligence on the part of Burnham. Whether or not Burnham was justified in accepting the reports and statements from a manager of a bank as to what the record of his bank showed, and whether or not it was his duty to personally examine the books of a rival bank operated by Anthony, may be a close question. However that may be, while of great importance as affecting the beneficiaries of this trust, it is unimportant as between Burnham and Anthony and any possible negligence in that regard would not make the shortage of Anthony the obligation of Burnham, in the sense here contended for.
As conceded by this appellant, this entire matter rests upon the proposition that one-half of the payment made was paid upon the obligation of Burnham, as his surety. The only part of the order which fixed the amount of the shortage, $36,851.70, also fixed the fact that it was taken by Anthony. The bank of which Anthony had been manager, paid $24,828.72 of this shortage, covering that portion represented by manipulation of the books of that bank. This appellant paid $13,518.39, representing the other amount which Anthony had become obligated to return to the estate. Under its bond it stood responsible for him. Having paid this amount it seeks to recover one-half thereof from Burnham as having been paid upon his obligation and because the beneficiaries might have collected this one-half from him. If the beneficiaries could have established negligence on the part of Burnham, they might have collected the entire amount from him and not merely one-half thereof. By attempting to collect from Burnham a part of the amount paid instead of all, this appellant, in effect, admits that the matter is not governed entirely by the strict letter of the statute but by equitable rules and considerations. In the light of these rules, it must be held that the amount thus paid was paid in satisfaction of an obligation owed by Anthony and not by Burnham.
A further equitable consideration is that at the time this amount was paid by this appellant, it obtained an assignment of the interest of Anthony in this trust estate. On the orginal appraisement of the estate this interest amounted to $21,860.72. (Estate of Whitney, 78 Cal.App. 638 [248 P. 754].) However, the evidence shows that while the *Page 121 
estate was originally appraised at $561,000, there has already been distributed to the beneficiaries $780,000 and about $300,000 remains to be distributed. While the exact figures are not before us as to the final value of Anthony's interest in the estate, or as to what portion thereof has already been paid to him, it would seem that Anthony's remaining interest in the estate, which has been assigned to this appellant, would leave it a handsome profit, were its present contentions sustained.
[3] In this connection we may consider the appeal of George Burnham, individually, from that portion of this order refusing to allow the claim of the appellant surety company for subrogation as to his interest in this estate, which provides that this refusal to allow such subrogation is "without prejudice", it being contended that the order should have been absolute. For the reasons above set forth, we think this whole question is not dependent upon what the appellant surety company finally receives from their assignment of Anthony's interest in the estate, nor on any future determination as to negligence on the part of Burnham, important as such a question might be if raised by the beneficiaries, but that upon the issue raised by this surety company the obligation paid by them was that of Anthony, and that this portion of the order appealed from should be modified by striking out the words "without prejudice".
[4] The next question, presented by the appeal of George Burnham, as trustee, is whether he is entitled to an order for the application of sufficient of the trust funds now distributable or to be hereafter distributed under the bequest to Anthony, to cover the cost of the audit of the affairs of the trust estate. In the sixth account, as filed by Burnham, the expense of this audit was set forth as $1867.64, and alleged to be chargeable to Anthony, with a prayer that the same be so charged. The court made no finding with respect to charging this expense to Anthony, but did find that the same was incurred by Burnham, as trustee, for a complete audit of the estate and trust estate; that this expense was incurred by reason of the misapplication of certain funds of the trust estate by Anthony as therein found; and also "that while said sum is a reasonable charge for the services rendered by said accounting firm, it is not a proper expense of said trust and for that reason the same is disallowed *Page 122 
as a charge against said estate, but without prejudice to any legal or equitable right of said George Burnham against said Herbert E. Anthony in the premises". In effect, the court in this order reserved its decision upon this question. The matter was again presented in the seventh account and the court found as follows: "I have no doubt, and so find, that such an audit was necessary, that Burnham acted in the utmost good faith and rendered a great service to the estate by his employment of such accountants to find defalcations caused solely by the misappropriation of funds by his co-executor, but having obtained no order authorizing such employment, and this item being disallowed in a former account, I see no authority to now allow it or declare it a lien upon the beneficial interests of Herbert E. Anthony, as much as I believe it should be; but I shall adopt the words of the former order: `but without prejudice to any legal or equitable right of said George Burnham against said Herbert E. Anthony in the premises'."
It is the contention of the National Surety Company that the expense of this audit cannot be charged to Anthony's interest in the trust estate, for the following reasons: `That the audit was made necessary because of Burnham's negligence; that the court denied it as a charge against the estate and at the same time charged the entire estate equally to Burnham and Anthony; that the matter is res judicata since the court held that it was not to be charged against the estate; that it is merely an individual claim on the part of Burnham, which must be prosecuted, if at all, in a separate action; and that the court had no authority to act on the matter at the hearing on his seventh account because Anthony was not then before the court and his interest in the trust estate was then held by a third party, namely, this surety company.
As we have already pointed out, the court, in its order settling the sixth account, neither finally settled the matter of this audit expense, nor adjudicated that Burnham was equally liable with Anthony, as between themselves. Nor do we think the necessity for this audit can be attributed by the surety company to any negligence on the part of Burnham. There was evidence to the effect that Burnham had not himself kept a full set of books and that he had not *Page 123 
checked up on the reports made to him by Anthony. While this is relied on as establishing negligence on his part, it also appears from the evidence that the methods used by Anthony in manipulating the records, even to the extent of carrying double ledgers in his bank, were not only calculated to deceive his cotrustee, in spite of any care that might have been used, but were also sufficient to deceive the bank examiners for many years. It appears that reports turned over by Anthony to Burnham, and the various reports filed in the estate actually set forth the true condition of the estate as it should have been, but the trouble largely lay in Anthony's secret manipulation of the funds of his own bank. It even appears that he allowed and reported interest on funds reported as then being in his bank. Burnham could hardly be expected to go into the bank operated by his rival and there ascertain more than the bank examiners were able to find. Even taking the evidence as conflicting the court found that this expense for an audit was incurred solely by reason of the defalcations of Anthony. The court's order did not charge this expense against the trust funds, but made its order without prejudice as between the two trustees.
While the question of negligence on the part of Burnham might be important with reference to an attempt to hold the trust estate for this expense, a different situation is presented where the only question is as to the power of a probate court, in equity, to reimburse Burnham for this expense through Anthony's interest in the trust estate, which is still under the control of the court. [5] It has been held that probate courts have both probate and equity jurisdiction and that where necessary to do justice, a probate court may exercise equitable jurisdiction. (Verdier v. Roach, 96 Cal. 467 [31 P. 554, 557]; Bauer v.Bauer, 201 Cal. 267 [256 P. 820].) In this instance, in its order settling the sixth account, the court particularly reserved both the legal and the equitable rights of Burnham, in this respect. Nor do we think a separate action by Burnham against Anthony was necessary, as contended for by the surety company. The matter arose out of this trusteeship, the item of expense claimed was, in fact, a part of the cost of handling the trust, it was necessitated by actions of Anthony in connection therewith, and the only question presented is whether it may be *Page 124 
charged against Anthony's beneficial interest in the trust estate. In Verdier v. Roach, supra, the court said: "Our superior courts have both probate and equity jurisdiction, so that whenever, in the course of the administration and settlement of estates, our probate statutes are found to be inadequate to authorize and accomplish all that a court of equity is authorized to do in such cases, our superior courts may exercise their equity powers in connection with and as incidental to their powers in probate matters to the extent necessary to a complete administration and distribution of estates; provided, of course, that nothing be done in contravention of any statutory provision."
It would be contrary to all principles of equity to hold that this beneficial interest in the trust estate must first be distributed and paid out and that, thereafter, incidental claims as to who is equitably entitled thereto should be separately litigated. This audit was both necessary and valuable to the estate and even though the cost thereof should not be borne by the estate itself, this cost should be paid by Anthony who made it necessary, and not by Burnham. And the probate court, having control over both the subject matter and the body of the estate, including Anthony's interest therein, has jurisdiction to complete its work by ordering the amount paid out of that interest. Nor do we think this is changed by the fact that the beneficial interest of Anthony in the trust estate was assigned to the bank and later to this surety company. The order settling the sixth account fixed the fact of Anthony's liability, but expressly reserved these other questions which go to the amount of that liability. Anthony was liable not only for his shortage but for the costs and expenses which were necessitated thereby. He could not claim his beneficial interest in the estate until these costs and expenses have been paid, in addition to the amount of his defalcations, and we think his surety is in no better position. The surety company, for a consideration, agreed to stand responsible for his actions. His defalcations had occurred and were known before any assignment of his interest in the estate was made, and by assignment this interest is now held not only by a party who acquired it with full knowledge of the facts, but by one who has assumed responsibility for the very acts of Anthony which caused the expense. For this reason, we think the cases *Page 125 
cited by the surety company, involving the assignment of interests in estates to innocent parties before other rights had vested, have no application here. This surety company stands in the shoes of Anthony and it must be held to have taken his interest in the estate as it then was, subject to all of its burdens.
[6] In our opinion, it must be held to be the duty of Anthony to fully reimburse the estate and his cotrustee for all amounts taken and all expenses necessarily caused by his defalcations, before he may withdraw his beneficial interest in the estate or before this may be withdrawn by the surety who stood sponsor for him. Under the circumstances here shown, the court should have ordered the expense of this audit paid out of the beneficiary interest of Anthony in the trust estate, as the same becomes available through distribution.
[7] The only other question presented is the contention of the National Surety Company that the court erred in subjecting the beneficial interest of Anthony in the trust estate to payment of the compensation for services rendered and to be rendered by the trustee appointed in place of Anthony, after his removal. The new trustee appointed to take his place is, of course, entitled to compensation. Such compensation is a regular expense of the trust and stands upon the footing of costs. By the will of the deceased Anthony was given a certain fixed interest in the trust estate, in full compensation for all of his services as executor and as trustee, until the final distribution of the estate to the beneficiaries of the trust. This definite interest having been given to Anthony as compensation for these services, which he has made it impossible for him to complete, equity demands that his substitute be paid from this fund and not by the other beneficiaries of the trust. Where, as here, the court still has this fund in its control, we are of the opinion that it has the power and that it is its duty to subject the same to the payment of claims justly chargeable thereto, before paying said fund to the defaulting trustee, or to this assignee.
For the reasons given the order here appealed from is affirmed in all respects, except as follows: That portion of the order disallowing the petition of National Surety Company for subrogation to the beneficial interest of George *Page 126 
Burnham in the trust estate, without prejudice, is reversed, with directions to enter an order denying said petition. That portion of the order denying, without prejudice, the application of George Burnham to subject the beneficial interest of Anthony in said trust estate to the payment of the expense of the audit in the sum of $1867.64, with interest thereon, is reversed with instruction to enter an order in conformance with the views herein expressed, and providing for the payment of said expense from the beneficial interest of Anthony as the same becomes available for distribution.
Marks, J., and Scovel, J., pro tem., concurred.
A petition for a rehearing of this cause was denied by the District Court of Appeal on June 30, 1932, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 4, 1932.