[Nos. A101681, A104110, A104111, A104693. First Dist., Div. One. May 18, 2005.]

SUSAN DAVID, Plaintiff and Respondent, v.
WENDY ALTER HERMANN, Individually and as Trustee, etc., Defendant and Appellant.

## COUNSEL

John A. Hartog, Inc., John A. Hartog; McInerney & Dillon, and Jewell J. Hargleroad for Defendant and Appellant.

Law Offices of Catherine Duggan, Catherine Duggan; Law Offices of Robert E. White, Robert E. White and Susan C. Rushakoff for Plaintiff and Respondent.

## OPINION

**SWAGER, J.**—This is an appeal from a judgment adjudicating a trust to be invalid on the ground of undue influence and fraud and from postjudgment orders concerning attorney fees. We reverse the portions of the judgment and the orders relating to attorney fees and otherwise affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

The litigation arises from a history of disputes between the daughters of Zal and Jane Alter, both now deceased. The petitioner, Susan David (hereafter Susan), is the older daughter; the defendant, Wendy Alter Hermann (hereafter Wendy), is the younger. The property at issue consists primarily of the family business, the 300 Company, which owns and manages a commercial building at 300 Brannan and an apartment building at Hayes and Divisidero, both in San Francisco. In recounting the factual background, we will rely on the trial court's lengthy and detailed statement of decision.

On January 31, 1989, Zal and Jane Alter created a revocable living trust, called the Alter Family Trust, as part of an estate plan recommended by their attorney. The complex trust provisions effectively called for equal distribution of the trust assets between their daughters on their death. Zal Alter was the sole trustee, but he was then experiencing declining health and mental ability. Sometime in 1989, Susan began to assist Zal in writing checks, paying taxes, balancing accounts, and managing the 300 Company. Later in 1990, she began to sign checks with her father's approval and to assume control of the trust estate. On September 17, 1990, Zal suffered a fall and became entirely incapacitated.

The year 1990 brought changes in the lives of other members of the family. Recently divorced, Wendy moved from Fresno to Marin County where she still resides. Jane separated from Zal after 50 years of marriage and began to live alone in a condominium in San Francisco. While undertaking this difficult transition, Jane was experiencing declining health and failing eyesight. Wendy began to see her mother frequently and assisted her in the tasks of daily living.

In August 1990, the strained relations between the two daughters experienced a serious rift. As advised earlier by his estate planning attorney, Zal decided to make a series of gifts to his family in the amount of the gift tax exemption. Susan wrote the checks on his behalf. Zal gave $20,000 to each of his daughters and $10,000 to each of his four grandchildren and, in addition, gave $10,000 to Susan's husband. The effect was a $10,000 imbalance in favor of Susan's side of the family. Wendy complained to Jane and contacted her parents' attorneys. She scheduled a meeting with the firm on October 4, 1990, a day before Susan was scheduled to leave for a three-week vacation in Europe. When Susan returned from the vacation, she learned from her father's business partner that Wendy was accusing her of dereliction in the management of the family's financial affairs.

On March 5, 1991, Jane revoked her interest in the Alter Family Trust. The same day, she executed a will by which she disposed of her separate property and her share of the community property, "including all [her] former trust property," which she held with her husband. She gave half the residue of her estate in equal shares to Wendy and the other half to the "then-living issue" of Susan. The will explicitly omitted to provide directly for Susan and appointed Wendy as executor of her estate.

In April 1991, Wendy and Jane filed a petition in San Francisco Superior Court for an accounting and for removal of the trustee of the Alter Family Trust and appointment of a successor trustee. The petition alleged that Zal suffered from senile dementia and that the trust instrument provided that Jane, Susan, and Wendy would serve as cotrustees in the event of his incapacity. It alleged that Susan had unilaterally taken control of trust affairs, made unauthorized gifts of trust assets, improperly paid herself compensation for her duties as trustee, and failed to pay for Zal's necessary expenses.

Concurrently with filing the petition, the parties stipulated to appointment of a trust company as the successor trustee. When the trust company declined the appointment, the parties stipulated to the appointment of an independent fiduciary, Debra J. Dolch, as successor trustee by an order filed July 17, 1991. The order provided for the equalization of gifts by an additional $10,000 gift to Wendy.

In further probate proceedings on the same petition, Susan filed two accounts and reports covering the period of September 17, 1990, to September 11, 1991. By a stipulation and order filed August 11, 1992, the court approved the accounting "as filed and all of her actions in connection with [the Alter Family Trust] as reported therein, . . . are confirmed and approved."

In an order filed January 4, 1993, the court approved the first account and report as amended of the successor trustee, Debra Dolch, and directed her to petition for the establishment of a conservatorship for Zal and to seek instructions as to the transmutation of Zal and Jane's shares in the Alter Family Trust into their separate property. Dolch petitioned for instructions as directed and the matter came up for a hearing on April 27, 1993, in which Zal, Jane, and the trustee were separately represented by counsel. With the agreement of the attorneys present, the court adopted an order filed June 17, 1993, that went well beyond the objective of the original petition and directed inter alia that Zal's share of the trust assets would remain in the existing trust and Jane's equal share would be transferred to a new trust designated the Jane Alter Living Trust.

The Jane Alter Living Trust, which was executed on June 8, 1993, named Wendy as trustee. It provided that if Zal predeceased Jane, the trust assets would be distributed one-half to Wendy and one-half in equal shares to her four grandchildren. The effect was to restrict the distribution to Susan's children to one-fourth of the estate. In the event Zal was still living on Jane's death, the trust provided that half of the assets would be held in a terminable interest trust (Q-TIP trust) for the benefit of Zal during his life.

Concurrently with creation of the Jane Alter Living Trust, Jane made a will disposing of all property that might not have been transferred to the trust and seeking to exercise a power of appointment in the Alter Family Trust, conditional upon a determination that the power of appointment was still effective. On November 20, 1996, she executed a first codicil to her will that again sought to exercise the power of appointment in the Alter Family Trust.

Zal died on June 9, 1995. Since separating from Zal, Jane had also suffered a progressive decline in her physical and mental condition. She walked with difficulty and was slowly going deaf and blind. The trial court found that she began to suffer from a degree of cognitive impairment that impeded her ability to review records, reason abstractly, or make sound judgments. With her declining physical and mental capacities, Jane became increasingly dependent on Wendy. The trial court found, "for example, that Wendy drove Jane to attorneys' offices, banks and medical appointments, among other things. . . . Wendy was trustee of the Jane Alter Trust and, as such, had

control of all her assets, handled all her financial affairs and, at least at some point between 1990 and 1995, started paying all of her bills as well." Jane's dependence on Wendy was accompanied by the growth of an intense and irrational anger toward Susan. As the trial court found, "[s]he had it in her mind that Susan had stolen money from the Alter Family Trust, and she would not let this notion go."

In early November 1995, Wendy took Jane to her attorney, Sterling Ross, to have an amendment prepared for the Jane Alter Living Trust. Ross referred her to independent counsel, Marila Marshall, who drafted the document. In the trial court's words, she was then "blind, hard of hearing, in a wheelchair and had been weakened mentally by a series of strokes. Her cognitive abilities were diminished." On November 2, 1995, she executed a second amendment (Second Amendment) to the Jane Alter Living Trust, which largely excluded Susan and her family from receiving trust assets. The amended trust gave each of the four grandchildren the sum of $10,000 and provided that, if Wendy were living at the time of her death, the remaining trust estate would be distributed to her. If Wendy were not living, 75 percent of the estate would go to Wendy's family and 25 percent to Susan's family.

Jane died on October 23, 1997. On December 4, 1997, Wendy filed a petition for probate of Jane's will in San Francisco Superior Court. In response, Susan filed a petition for declaratory relief seeking a determination that a contest to the admission of Jane's will into probate would not constitute a challenge to Zal's will or the Alter Family Trust and succeeded in obtaining a declaratory judgment to that effect. About two months later, Susan filed a contest to probate of Jane's will. Wendy filed an answer to the contest, but the record discloses no further proceedings on the petition for probate or the will contest.

On February 22, 2000, Susan filed a petition in the Marin County Superior Court that led to the judgment here on appeal. The petition seeks an order adjudicating the Jane Alter Living Trust and the Second Amendment to the trust to be invalid on the ground of Jane's incapacity or Wendy's undue influence over Jane. In its statement of decision, the trial court found that, despite Jane's declining health, the evidence did not show that she lacked competence to execute the Jane Alter Living Trust. Turning to the issue of undue influence, the court declined to apply a presumption of undue influence on the ground that the evidence was insufficient to support a finding that Wendy procured the documents, but, in a very thorough review of the evidence, the court still found that the allegation of undue influence had been proven. The court proceeded to also find that the dispository provisions were caused by misrepresentations of Wendy that were intended to alienate Jane from her oldest daughter. The decision declared the Jane Alter Living Trust

and the Second Amendment to the trust to be void, and ordered Wendy to pay the attorney fees that Susan had incurred in the action. The court entered a judgment in the action on December 10, 2002, including attorney fees in an amount to be determined.

Susan moved for a determination of attorney fees in accordance with the judgment. On May 12, 2003, the court awarded her attorney fees in the sum of $180,187.50, and on July 30, 2003, the court entered an amended judgment incorporating this award of attorney fees.

Susan next took steps to enforce the judgment for attorney fees by recording an abstract of judgment and obtaining an order for a debtor's examination. On October 8, 2003, Wendy moved for a protective order to expunge the abstract of judgment and vacate the order for a debtor's examination. The trial court denied the motion in an order filed November 14, 2003.

Wendy has filed notices of appeal from the judgment entered on December 10, 2002; the order filed May 12, 2003, awarding attorney fees; the amended judgment filed July 30, 2003; and the order filed November 14, 2003, denying Wendy's motion for a protective order.

A.  *Subject Matter Jurisdiction*

■ As a first assignment of error, Wendy argues that the Marin County Superior Court lacked subject matter jurisdiction over Susan's petition challenging the Jane Alter Living Trust and the Second Amendment to the trust. Susan filed the petition in reliance on Probate Code section 17005, subdivision (a)(1), which authorizes the filing of proceedings affecting a living trust to be filed in "the county where the principal place of administration of the trust is located." It is undisputed that Wendy lives in Marin County and is the trustee of the Jane Alter Living Trust. Wendy nevertheless contends that the San Francisco probate court had previously assumed jurisdiction over "Jane's property subject to her testamentary disposition, either by will or a testamentary trust, . . ." The contention requires us to examine closely two previous orders of the San Francisco probate court.

As noted above, in an order filed January 4, 1993, approving the first account of the successor trustee of the Alter Family Trust, the San Francisco probate court directed the trustee to seek instructions with respect to the transmutation of community property of Zal and Jane into their separate property. With the stipulation of counsel for Zal, Jane, and the trustee, the court entered an order on June 17, 1993, that addressed not only this issue but other related issues concerning the division of the spouses' property. In

response to the original petition, the order directed that the property placed in the Alter Family Trust would remain community property and would not be transmuted into the separate property of Zal and Jane. In addition, it ordered the establishment of two separate trusts with provisions assuring fair treatment of each spouse by the other.

Specifically, the order directed Jane to establish "a fully-funded Q-TIP Trust for the benefit of [Zal] during his lifetime" in the form of an attached trust document designated the Jane Alter Living Trust. If Jane should fail to establish this trust before her death, the court would have the power to order the representative or trustee of her estate to "establish from her assets or the assets of her estate or trust the Q-TIP Trust." Similarly, if at the time of Zal's death "his existing estate plan [did] not provide for [Jane] in the form and amounts set forth in the Alter Family Trust," the court would have the power to order the representative or trustee of his estate to establish a trust "for the benefit of [Jane] during her remaining life, in an amount equivalent to the amount of the Q-TIP Trust which appears in the Alter Family Trust." The court allowed Jane's revocation of the Alter Family Trust conditional upon her execution of the Jane Alter Living Trust and directed that one-half of the trust assets be transferred to Zal's conservator and one-half to the Jane Alter Living Trust.

Lastly, the order provided: "This Court shall retain jurisdiction over [Zal] and [Jane] and the assets of the Alter Family Trust to enforce this order."

Wendy argues that her 1997 petition to probate Jane's will "revested" the San Francisco probate court with jurisdiction over Jane and her assets. The peculiarity of this petition is that it solely concerned the exercise of a power of appointment in the presumably revoked Alter Family Trust.[1] Wendy's petition to probate Jane's will filed December 4, 1997, stated that the estimated value of property of the estate was zero. Attachment 3c to the petition stated: "All of the decedent's assets were held in trust or will be transferred by other means. There will be no assets in the probate estate." The fourth paragraph of the will of Jane Alter attached to the petition specifically referred to the power of appointment and sought to exercise it in the event the revocation of the Alter Family Trust should be determined to be legally ineffective. The first codicil to the will of Jane Alter, which was also attached to

---

[1] Paragraph 6.3(d) of the Alter Family Trust provided in part: "The surviving Trustor shall have a power of appointment over the Residuary Trust to direct that, on his or her death, the balance of the Residuary Trust, including all principal and accrued or undistributed income, shall be distributed to the person or persons . . . in the amounts and on the terms and conditions . . . that the surviving Trustor designates in his or her last will duly admitted to probate and specifically referring to and exercising this power of appointment . . . . This power of appointment is exercisable by the surviving Trustor alone . . . ."

the petition, sought solely to "confirm the exercise in my Will of the power of appointment."

Susan contested the probate of the will on the grounds of incapacity and undue influence and on the further ground that the Alter Family Trust, which contained the power of appointment, had been revoked both by Jane and an order of the court. "Therefore, at the time of the execution of the purported will [of Jane Alter], the Trust was revoked and thus there was no document extant granting [her] said power."

We see nothing in the order filed June 17, 1993, that would affect the jurisdiction of the Marin County court to consider Susan's petition challenging the Jane Alter Living Trust. The San Francisco court acted on a petition by Debra J. Dolch requesting instructions on the transmutation of community property of Zal and Jane into separate property, and with the stipulation of the parties, approved a broad settlement regulating the division of property between the spouses following Jane's revocation of the Alter Family Trust. The court retained jurisdiction for the limited purpose of assuring that the settlement was carried out as directed. This limited reservation of jurisdiction did not conflict in any way with Susan's petition challenging the validity of the Jane Alter Living Trust.

We also see no basis for holding that the petition to probate Jane's will gave the San Francisco probate court prior exclusive jurisdiction over Jane's trust assets that precluded later filings in another county. Such prior exclusive jurisdiction cannot be predicated on in rem jurisdiction over Jane's estate since the petition stated that there were no assets subject to probate. The precedents cited in Wendy's brief regarding in rem jurisdiction of the probate court over a decedent's assets have no application in the absence of a probate estate. (*Estate of Wise* (1949) 34 Cal.2d 376, 382 [210 P.2d 497]; Prob. Code, § 7051.) Similarly, the cited authority regarding the continuing and exclusive jurisdiction of the probate court presupposes an estate subject to administration. (*Dungan v. Superior Court* (1906) 149 Cal. 98, 100 [84 P. 767]; *Marsh v. Edelstein* (1970) 9 Cal.App.3d 132, 142 [88 Cal.Rptr. 26]; *Estate of White* (1945) 69 Cal.App.2d 749, 757–758 [160 P.2d 204]; *Estate of Evans* (1944) 62 Cal.App.2d 249, 256 [144 P.2d 625].) Again, the petition has no relevance to the court's jurisdiction over the Jane Alter Living Trust since it was filed to exercise a power of appointment in a distinct trust, the Alter Family Trust. In the absence of the same subject matter, Wendy cannot rely on the rule that "the tribunal in which jurisdiction first attaches retains it exclusively." (*Slinack v. Superior Court* (1932) 216 Cal. 99, 106 [13 P.2d 670]; see *Jordan v. Clausen* (1936) 13 Cal.App.2d 16, 19–20 [56 P.2d 240].) Finally, we see no relevance to Wendy's discussion of testamentary trusts since the judgment at issue in this appeal concerned the validity of a living

trust. (*Estate of Cox* (1970) 8 Cal.App.3d 168, 180 [87 Cal.Rptr. 55]; Prob. Code, § 17005, subd. (a)(2).)

■ We construe Susan's petition challenging the dispository provisions of the Jane Alter Living Trust as a proceeding to determine the validity of a trust provision that came within the category of proceedings concerning the internal affairs of a trust under Probate Code section 17200, subdivision (b)(3). (*Saks v. Damon Raike & Co.* (1992) 7 Cal.App.4th 419, 429 [8 Cal.Rptr.2d 869].) Under Probate Code section 17000, "the superior court having jurisdiction over the trust" had exclusive jurisdiction over the proceedings. The Marin County Superior Court possessed such jurisdiction because the trustee resided in that county.

## B. *Res Judicata*

■ Wendy next maintains that the trial court was barred by the principle of collateral estoppel from finding that "the charges against Susan in the April 1991 petition were . . . unfortunate and irresponsible allegations of wrongdoing that never occurred." The defense of res judicata, however, was not pleaded or otherwise raised in the trial court. "Res judicata is not a jurisdictional defense, and may be waived by failure to raise it in the trial court." (7 Witkin, Cal. Procedure (4th ed. 1997) Judgment, § 281, p. 821.) Moreover, the allegations in the April 1991 petition were never adjudicated in the San Francisco probate court. Instead, the proceeding was terminated by a stipulated order appointing a successor trustee. While a stipulated judgment may have collateral estoppel effect in California (*California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1990) 50 Cal.3d 658, 665 [268 Cal.Rptr. 284, 788 P.2d 1156]), probate orders are conclusive only as to matters "actually passed upon by the probate court." (*Estate of de Laveaga* (1958) 50 Cal.2d 480, 487 [326 P.2d 129]; see *Lazzarone v. Bank of America* (1986) 181 Cal.App.3d 581, 591 [226 Cal.Rptr. 855].)

## C. *Substantial Evidence*

Contending that the court "misapplied the applicable legal standards to invalidate a testamentary document based on undue influence or fraud," Wendy advances two arguments involving issues of law and substantial evidence. With respect to the court's finding of undue influence, she argues that the invalidation of a testamentary document on this ground requires evidence of procurement, which is lacking in the present record. In the case of fraud, she argues that a finding of fraud requires evidence of intent to deceive, which cannot be found in the present record.

### 1. *Undue influence*

■ California courts have long held that a testamentary document may be set aside if procured by undue influence. (*Estate of Ricks* (1911) 160 Cal. 467, 480 [117 P. 539]; Prob. Code, § 6104.) As authoritatively defined in *Rice v. Clark* (2002) 28 Cal.4th 89, 96 [120 Cal.Rptr.2d 522, 47 P.3d 300], "[u]ndue influence is pressure brought to bear directly on the testamentary act, sufficient to overcome the testator's free will, amounting in effect to coercion destroying the testator's free agency." (See also *Estate of Shay* (1925) 196 Cal. 355, 363 [237 P. 1079]; *Hagen v. Hickenbottom* (1995) 41 Cal.App.4th 168, 182 [48 Cal.Rptr.2d 197]; *Estate of Sarabia* (1990) 221 Cal.App.3d 599, 604 [270 Cal.Rptr. 560]; *Estate of Truckenmiller* (1979) 97 Cal.App.3d 326, 334 [158 Cal.Rptr. 699]; Civ. Code, § 1575.)

"The proof of undue influence by circumstantial evidence usually requires a showing of a number of factors which, in combination, justify the inference, but which taken individually and alone are not sufficient." (12 Witkin, Summary of Cal. Law (9th ed. 1990) Wills and Probate, § 189, p. 218.) Among the indicia of undue influence is evidence that " 'the chief beneficiaries under the will were active in procuring the instrument to be executed.' " (*Estate of Lingenfelter* (1952) 38 Cal.2d 571, 585 [241 P.2d 990]; see *Estate of Franco* (1975) 50 Cal.App.3d 374, 382–383 [122 Cal.Rptr. 661].) While the person challenging the testamentary instrument ordinarily has the burden of proving undue influence, "under certain narrow circumstances, a presumption of undue influence may arise, shifting to the proponent of the disposition the burden of proving by a preponderance of the evidence that the donative instrument was *not* procured by undue influence." (*Conservatorship of Davidson* (2003) 113 Cal.App.4th 1035, 1059 [6 Cal.Rptr.3d 702].) Evidence that the beneficiary procured the testamentary instrument is one of three circumstances required to create this presumption. A presumption of undue influence "arises upon the challenger's showing that (1) the person alleged to have exerted undue influence had a confidential relationship with the testator; (2) the person actively participated in procuring the instrument's preparation or execution; and (3) the person would benefit unduly by the testamentary instrument." (*Rice v. Clark, supra*, 28 Cal.4th 89, 97; see *Estate of Fritschi* (1963) 60 Cal.2d 367, 376 [33 Cal.Rptr. 264, 384 P.2d 656].)

■ Thus, while evidence of procurement is highly probative of undue influence and figures repeatedly in judicial discussions of the principle, it is essential to proof of undue influence only if the court relies on the presumption of undue influence to shift the burden of proof to the proponent of the testamentary instruction. In the case at bar, the court did not rely on the presumption, but rather applied the general principle of undue influence to a review of all the evidence. Appellant cannot challenge the court's finding of

undue influence by showing only the weakness or absence of evidence of procurement; other factors in combination can also support this finding. To challenge the finding, she must show that the evidence as a whole does not satisfy the general standard for proof of undue influence. We consider that, as a matter of law, her arguments relying exclusively on the one factor of procurement necessarily fail to show a lack of substantial evidence supporting the finding of undue influence.

■ Our conclusion requires affirmance of the judgment invalidating the dispository provisions of the Jane Alter Living Trust and the Second Amendment to the trust. It is immaterial whether or not the trial court erred in applying the alternative principles of fraud. "If the *decision* of a lower court is correct on any theory of law applicable to the case, the judgment or order will be affirmed regardless of the correctness of the grounds upon which the lower court reached its conclusion." (*Estate of Beard* (1999) 71 Cal.App.4th 753, 776 [84 Cal.Rptr.2d 276].) "No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." (*Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117].) Nevertheless, we will examine briefly the finding of fraud.

### 2. *Fraud*

■ The theories of undue influence and fraud commonly rest on a similar factual basis since contestants relying on a theory of undue influence may claim that the beneficiary employed misrepresentations to pressure the testator. They are, however, distinct grounds for contest. In *Estate of Newhall* (1923) 190 Cal. 709 [214 P. 231], the court held that the issue of fraud should have been submitted to the jury even though the evidence was insufficient to support a finding of undue influence. The court explained, "In cases where fraud alone is relied upon as a ground of contest it is the theory of the law that the testator, even though acting, in a manner of speaking, of his own free will, was, nevertheless, deceived by false data into doing that which he would not have done had he not been fraudulently imposed upon. [¶] . . . [F]alse representations . . . have been held to constitute fraud if it can be shown that they were designed to and did deceive the testator into making a will different in its terms from that which he would have made had he not been misled." (*Id.* at p. 718.)

The elements of fraud in the procurement of a testamentary instrument are the same as those required to vitiate a contract. "One of the necessary

elements is an intent to deceive the decedent or an intent to induce decedent to execute his will." (*Estate of Newhall, supra,* 190 Cal. 709, 719; see Civ. Code, § 1572.) Reversing a judgment of fraud, the court in *Estate of Benton* (1901) 131 Cal. 472, 478 [63 P. 775], found that "the all-important element is lacking, to wit: That Herbert A. Benton made these representations with intent to deceive the decedent, or with intent to induce decedent to execute his will. An intent to do one of these things is always an element and a necessary element in any given state of facts, in order that those facts may constitute actual fraud."

The proof of intent to deceive, "[f]rom the very nature of the inquiry . . . must necessarily be largely or wholly circumstantial. . . . The contestant is not confined to the bare facts but is entitled to the benefit of all inferences which may legitimately be drawn from the facts established." (*Estate of Newhall, supra,* 190 Cal. 709, 721.)

In the case at bar, the court found: "There is no rational explanation for this sudden shift in attitude by Jane toward and break with Susan in September 1990 other than Wendy's falsely poisoning Jane's mind against Susan because of her (Wendy's) anger over the perceived slight in the August 1990 gifts. In other words, there is compelling circumstantial evidence that Wendy made continuing misrepresentations about Susan to their mother for the purpose of alienating Susan from her mother and effecting Susan's and her family's disinheritance. Proof that a testator/settlor is induced by misrepresentations into making dispositions that would not have been made absent those misrepresentations constitutes fraud."[2]

The statement of decision provides a detailed narrative supporting these conclusions. The court traced the change in Jane's attitude toward Susan to a period beginning in August 1990 and extending into the first months of 1991. It was during this critical period, the court found, that Wendy became enraged at Susan for the perceived slight in Zal's gifts to her family and sought representation of legal counsel. When Susan returned from a trip to Europe, she was confronted with accusations of Wendy and Jane that were later reflected in the petition filed in April 1991 to remove her as trustee. This period also marked the beginning of a close and dependent relationship between Jane, who had recently separated from Zal, and Wendy, who had moved from Fresno to Marin County.

---

[2] Wendy vigorously criticizes a sentence in the statement of decision that alludes to "her [Wendy's] failure to disabuse Jane of what Wendy knew to be untruths," arguing that she had no duty to disabuse her mother of her beliefs. We place no reliance on this statement and note that "a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason." (*Davey v. Southern Pacific Co., supra,* 116 Cal. 325, 329 [48 P. 117].)

The court found that none of the allegations in the April 1991 petition had any basis in fact but Jane's alienation from Susan still hardened and intensified over time, displaying elements of the "siege mentality" described by Susan's expert witness, psychologist Abraham Nievod. The court inferred that Wendy induced this alienation by the misrepresentations reflected in the petition: "there is no basis that the Court can find in the record for any of the claims that were made against Susan in the petition. . . . Absent an effort wrongfully to discredit Susan and turn her mother against her, there is no reasonable explanation as to how the situation could have progressed to the point it did, with Wendy and Jane treating Susan like something short of a criminal in spite of all the work she had done for the benefit of the family."

■ Wendy points to a mass of evidence that might justify her distrust of Susan and argues that the court erred in finding that she intended to deceive Jane about Susan's conduct. But "in examining the sufficiency of the evidence to support a questioned finding, an appellate court must accept as true all evidence tending to establish the correctness of the finding as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion. Every substantial conflict in the testimony is, under the rule which has always prevailed in this court, to be resolved in favor of the finding." (*Bancroft-Whitney Co. v. McHugh* (1913) 166 Cal. 140, 142 [134 P. 1157].) For the purpose of this appeal it is relevant only that the trial court found Susan's testimony to be most credible and drew reasonable inferences from the facts recounted in its statement of decision. The facts themselves find support in the record. We therefore are compelled to uphold the finding of fraud.

## D. *Attorney Fees*

In its statement of decision, the trial court ruled that Susan could recover attorney fees on equitable principles or, alternatively as an element of damages under *Prentice v. North Amer. Title Guar. Corp.* (1963) 59 Cal.2d 618, 620 [30 Cal.Rptr. 821, 381 P.2d 645]. The judgment entered concurrently with the statement of decision ordered that Susan could recover "her reasonable attorney's fees and costs of suit incurred" from "Wendy's share of the estate of Jane Alter." Susan subsequently moved for a "determination of attorneys fees in accordance with judgment." In an order filed May 12, 2003, the court set the judgment for attorney fees at $180,187.50, and filed an amended judgment ordering Wendy to pay Susan attorney fees in this amount.

In this appeal, Wendy attacks the judgment for attorney fees both on procedural and substantive grounds. Since we agree that Susan was not

entitled to the judgment under substantive law, we do not reach her procedural objections. We turn first to the justification for awarding attorney fees as damages under *Prentice* and its progeny.

■ In *Prentice*, an escrow holder was negligent in closing the sale of property. As a consequence, the sellers were forced to bring a quiet title action against the purchaser and the holder of a first deed of trust. The sellers secured a judgment of damages against the escrow holder, which included the cost of the quiet title action. Affirming the judgment, the court held: "A person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures thereby suffered or incurred." (*Prentice v. North Amer. Title Guar. Corp., supra,* 59 Cal.2d 618, 620.)

The court explained that the judgment was not concerned "with 'the measure and mode of compensation of attorneys' but with damages wrongfully caused by defendant's improper actions. [¶] When a paid escrow holder has, as in this case, negligently made it necessary for the vendor of land to file a quiet title action against a third person, attorney's fees incurred by the vendor in prosecuting such action are recoverable as an item of the vendor's damages in an action against the escrow holder. [¶] Here the natural and proximate consequence of defendant's negligence was to require plaintiffs to file an action seeking to quiet their title against claims by either the [purchaser] or [lender]." (*Prentice v. North Amer. Title Guar. Corp., supra,* 59 Cal.2d 618, 621 (*Prentice*).)

Decisions applying *Prentice* recognize that it represents an application of the usual measure of tort damages in circumstances where the defendant's tortious conduct has made it necessary for a plaintiff to incur legal expenses to protect his interests. The court in *Heckert v. MacDonald* (1989) 208 Cal.App.3d 832, 838 [256 Cal.Rptr. 369], observed, " 'In such cases there is no recovery of attorney fees qua attorney fees.' " Upholding a judgment for damages against an insurance broker, the court in *Saunders v. Cariss* (1990) 224 Cal.App.3d 905, 910 [274 Cal.Rptr. 186], held that the damages properly included the cost of suit against the insurer. "[Plaintiff] is not seeking the fees paid to his attorney for prosecuting this action against [the insurance broker]. Rather he is claiming as damages those attorneys fees he incurred in attempting to mitigate the damages caused by [the broker's] alleged malpractice."

As noted in *Sooy v. Peter* (1990) 220 Cal.App.3d 1305, 1310 [270 Cal.Rptr. 151], "nearly all of the cases which have applied the [*Prentice*] doctrine involve a clear violation of a traditional tort duty between the

tortfeasor who is required to pay the attorney fees and the person seeking compensation for those fees." Thus, the rule has been applied to cases involving breach of an escrow holder's duty of due care to the seller (*Bruckman v. Parliament Escrow Corp.* (1987) 190 Cal.App.3d 1051, 1060 [235 Cal.Rptr. 813]; *Ruth v. Lytton Sav. & Loan Assn.* (1968) 266 Cal.App.2d 831, 844–845 [72 Cal.Rptr. 521]), the breach of a real estate broker's fiduciary duty to his client (*Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 507–508 [198 Cal.Rptr. 551, 674 P.2d 253]; *Heckert v. MacDonald, supra,* 208 Cal.App.3d 832, 836–838), the fraudulent misrepresentation of a process server (*Slaughter v. Legal Process & Courier Service* (1984) 162 Cal.App.3d 1236, 1251–1252 [209 Cal.Rptr. 189]), and intentional interference with use of an easement (*Manning v. Sifford* (1980) 111 Cal.App.3d 7, 11 [168 Cal.Rptr. 387]) and intentional interference with an exclusive recording contract. (*Vanguard Recording Society, Inc. v. Fantasy Records, Inc.* (1972) 24 Cal.App.3d 410, 413–414 [100 Cal.Rptr. 826].)

*Prentice* made clear that Code of Civil Procedure section 1021 "prohibits the allowance of attorney fees against a defendant in an ordinary two-party lawsuit." (*Prentice v. North Amer. Title Guar. Corp., supra,* 59 Cal.2d 618, 620–621.) The courts have refrained from expanding the rule in a way that would undermine the general rule that a party bears his own attorney fees. (*Pederson v. Kennedy* (1982) 128 Cal.App.3d 976, 980 [180 Cal.Rptr. 740].) Reversing a judgment for attorney fees against one of three joint tortfeasors in *Vacco Industries, Inc. v. Van Den Berg* (1992) 5 Cal.App.4th 34, 57 [6 Cal.Rptr.2d 602], the court stated, "There is nothing about their relationship or their conduct that justifies singling out Van Den Berg as the one whose conduct caused Vacco to have to prosecute a legal action against the other two. . . . The rule of *Prentice* was not intended to apply to one of several joint tortfeasors in order to justify additional attorney fee damages. If that were the rule there is no reason why it could not be applied in every multiple tortfeasor case with the plaintiff simply choosing the one with the deepest pocket as the '*Prentice* target.' Such a result would be a total emasculation of Code of Civil Procedure section 1021 in tort cases."

It is clear that *Prentice* has no application to the present case. Susan did not bring an action against Wendy for damages on a tort theory of liability but rather petitioned the court for an order declaring the testamentary documents invalid. Moreover, the petition was essentially a two-party lawsuit, though Wendy was sued both individually and as trustee. Unlike *Prentice*, the judgment for attorney fees did not represent "an application of the usual measure of tort damages" (*Sooy v. Peter, supra,* 220 Cal.App.3d 1305, 1310), but rather was a device to award attorney fees in probate proceedings. To this extent, it served to supplant Code of Civil Procedure section 1021 and the ordinary rules and practices of probate court regarding the award of attorney

fees. If *Prentice* authorized the court to award attorney fees in this case, it would allow the recovery of attorney fees in all proceedings before the probate court to invalidate a testamentary document based on some alleged tortious conduct.

### E. *Equitable Award of Attorney Fees*

In her briefs, Susan does not argue that the judgment for attorney fees can be justified by the equitable powers of the probate court, as suggested in the statement of decision. Indeed, we are unable to formulate any rationale to uphold the judgment for attorney fees on this ground. The probate court, it is true, possesses the power to order an allowance out of a trust estate as reimbursement for expenses, including attorney fees. (7 Witkin, Cal. Procedure, *supra*, Judgment, § 151, pp. 670–671; *id.* (2005 supp.) Judgment, § 151, p. 156.) But it cannot be argued that Susan rendered such a service to the trust. The effect of her petition was to secure a decree adjudicating the trust to be "invalid and void." For her part, Wendy held the assets of the trust as "constructive trustee for the benefit of [all] persons entitled to distribution [thereof]." As constructive trustee, her sole duties were to account for her administration of the trust and to transfer the assets to the proper parties. We see no basis for implying a further duty to reimburse Susan for bringing a petition to invalidate the former trust. In any event, the amended judgment did not relate in any manner to trust administration under the supervision of the probate court but rather ordered that Susan recover attorney fees directly from Wendy. The judgment, in short, imposed a personal judgment in favor of Susan and against Wendy.

We see no relevance to the cases cited by the trial court. *Estate of Whitney* (1932) 124 Cal.App. 109, 121 [11 P.2d 1107], concerned an allowance from a trust estate to pay for an internal audit. *Wells Fargo Bank v. Marshall* (1993) 20 Cal.App.4th 447, 458 [24 Cal.Rptr.2d 507], which concerned a proceeding to construe the dispository provisions of a trust, awarded attorney fees to a successful contestant on the ground that it was consistent with "the evident intent of the trustor" as expressed in the trust instrument.

Since we find no basis in substantive law for the award of attorney fees to Susan, we do not reach the procedural objections that Wendy raises to the recovery of attorney fees. Our conclusion necessarily calls for reversal of the postjudgment order filed November 14, 2003, relating to enforcement of the judgment for attorney fees.

### DISPOSITION

We reverse the portion of the amended judgment filed July 30, 2003, awarding $180,187.50 in attorney fees to the petitioner Susan David, as well

as the portion of the judgment entered December 10, 2002, awarding attorney fees, and the order filed May 12, 2003, and the order filed November 14, 2003, denying inter alia Wendy's motion for a protective order.[3] In all other respects, the judgment is affirmed.

Each party shall bear her own costs on appeal.

Marchiano, P. J., and Stein, J., concurred.

A petition for a rehearing was denied June 17, 2005, and appellant's petition for review by the Supreme Court was denied September 7, 2005.

---

[3] The request for judicial notice filed October 1, 2004, by appellant is hereby granted. The request for judicial notice filed October 4, 2004, by respondent is also granted.