Filed 7/14/21 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF
CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JASON BRILEY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CITY OF WEST COVINA,<br><br>    Defendant and Appellant. | B295666<br><br>(Los Angeles County<br>Super. Ct. No.<br>BC630552)<br><br>ORDER MODIFYING<br>OPINION<br>[NO CHANGE IN JUDGMENT] |

THE COURT:*

It is ordered that the opinion filed July 1, 2021 be modified as follows:

On page two, line four replace the word "Alberts" with "Albers".

The modification does not change the judgment.

_____

*MANELLA, P. J.

Filed 7/1/21 (unmodified opinion)

# CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JASON BRILEY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CITY OF WEST COVINA,<br><br>    Defendant and Appellant. | B295666<br><br>(Los Angeles County Super. Ct. No. BC630552) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Terry Green, Judge.  Vacated in part, affirmed in part, and remanded with directions.

Jones & Mayer and Krista Macnevin Jee for Defendant and Appellant.

Liebert Cassidy Whitmore, J. Scott Tiedemann, David A. Urban and Alex Y. Wong for League of California Cities

and California Special Districts Association as Amici Curiae on behalf of Defendant and Appellant.

Public Employees Legal and Oshea V. Orchid; Benedon & Serlin, Douglas G. Benedon and Wendy S. Alberts for Plaintiff and Respondent.

_____

### INTRODUCTION

Respondent Jason Briley worked for appellant, the City of West Covina (the City), as a deputy fire marshal.  During his employment, Briley complained that various City officials, including his then-direct superior Larry Whithorn, had ignored his reports of safety issues and engaged in misconduct.  He later complained that Whithorn and others had retaliated against him in various ways.  The City commissioned an investigation of Briley's claims but ultimately concluded they were unfounded.  While this investigation was still pending, the City commissioned an investigation of allegations that Briley had repeatedly engaged in misconduct and unprofessional behavior.  At the conclusion of this second investigation, Whithorn initiated Briley's termination, and another City official upheld the decision.

Briley contended his termination was the result of retaliation for his prior complaints and initiated an appeal to the City's Human Resources Commission (HR Commission). The commission was to hold an evidentiary hearing and

3

deliver its findings and recommendations to Whithorn and City Manager Chris Freeland, who were the ultimate decisionmakers in the appeal.  However, Briley later abandoned the appeal, asserting, among other things, that the commission had no jurisdiction to consider his retaliation claims, and that the appeal procedure was futile and violated due process because Whithorn and Freeland were biased against him and had prejudged his claims.  He then filed this action against the City, alleging retaliation under Labor Code section 1102.5.

The City asked the trial court to dismiss Briley's action for failure to exhaust available administrative remedies, but the court concluded that an appeal to the HR Commission was unnecessary.  It found that the commission had no authority to consider Briley's retaliation claim, and that an appeal would have been futile because Whithorn and Freeland had been personally embroiled in appellant's matter.  The case proceeded to trial, and the jury found for Briley and awarded him about $4 million, including $2 million in past noneconomic damages and $1.5 million in future noneconomic damages.  The trial court later denied the City's motion for a new trial.  On appeal, the City claims the trial court:  (1) erred in concluding Briley was not required to exhaust his administrative remedies; (2) committed various evidentiary errors at trial; and (3) abused its discretion in failing to reduce the jury's excessive awards for noneconomic damages.

4

We conclude that Whithorn's involvement in the underlying dispute, on one hand, and his expected role in deciding Briley's appeal, on the other, violated the requirements of due process and therefore excused Briley from proceeding with his administrative appeal. We also find no reversible evidentiary error by the trial court. However, we agree with the City that the $3.5 million noneconomic damages award -- comprising $2 million in past and $1.5 million in future noneconomic damages -- was so excessive as to suggest it resulted from passion or prejudice. We therefore vacate the awards for past and future noneconomic damages and remand for a new trial on these issues, unless Briley accepts a reduction of the awards to $1 million and $100,000, respectively. In all other respects, the judgment is affirmed.

## BACKGROUND

*A. Briley's Employment with the City and His Subsequent Complaints Against Whithorn and Others*

In 2007, the City hired Briley as a fire-protection specialist and later promoted him to deputy fire marshal. As deputy fire marshal, Briley oversaw the operations of the Fire Prevention Bureau, which included checking building code plans for Fire Code compliance, inspecting existing buildings for compliance, and conducting fire investigations. Briley was initially supervised by Whithorn, then the fire marshal and assistant fire chief.

5

In June 2014, Briley complained to the City's HR director, Nita McKay, that several City officials, including Whithorn and then-City Manager Chris Chung, had failed to address his reports of Fire Code violations and had allowed a building permit to issue for a development before the building plans had passed fire inspection. McKay hired a private firm to investigate Briley's allegations and notified Chung and Whithorn. After making his initial complaints, Briley additionally complained that Whithorn and others had retaliated against him. Among other things, he alleged that Whithorn had canceled his scheduled overtime, moved him to a smaller office, and changed his take-home vehicle. These new allegations were included in the pending investigation. Briley also filed grievances against the City with the City's HR Commission, raising the same claims of retaliation and alleging that Whithorn had engaged in additional retaliation by giving him a poor performance review.[1] McKay resigned from her position in October 2014, before the investigation concluded. In January 2015, the investigating firm delivered its findings to then-Assistant City Manager Freeland, who also served as the acting HR director at the time. The firm concluded that Briley's allegations were largely unfounded, and Freeland adopted these findings. Whithorn later testified at his deposition that his working relationship with Briley had become

---

[1] The HR Commission ultimately concluded that most of Briley's claims did not constitute grievances within the commission's jurisdiction under the City's personnel rules.

6

"strained," that Briley had undermined his authority by bringing "trumped up charges," and that Briley had tried to intimidate him.

*B. Complaints Against Briley and the Larson Investigation*

While the investigation of Briley's allegations against City officials was still pending, Whithorn, Chung, and others informed Freeland of multiple complaints against Briley involving allegations of misconduct and unprofessional behavior. Among other things, Briley was alleged to have: (1) addressed a fire captain in an unprofessional manner and used profanity in addressing a local worker when responding to a fire alarm at a Victoria's Secret store; (2) improperly obtained a prospective City employee's personnel form; and (3) used profanity in addressing individuals at a CrossFit gym. Freeland then retained another firm to investigate the allegations against Briley. Carolin Larson, a private investigator and retired police officer, conducted the investigation.

During her investigation, Larson interviewed many witnesses, including Briley. Briley denied most of the allegations against him. In May 2015, Larson completed her investigation and delivered her 157-page report to the City. She concluded Briley had exhibited a pattern of unbecoming conduct, unprofessional behavior, and incompetence, and that he had been untruthful in denying the allegations

against him. By this time, Chung had left the City, and Whithorn had been elevated to fire chief.

*C. Briley's Termination and His Withdrawn Appeal to the HR Commission*

After reading Larson's report, Whithorn issued Briley a notice of intent to terminate. The City's finance director, Christa Bughagiar, conducted a pre-termination hearing, and in September 2015, decided to uphold Briley's termination and issued him a notice of termination. Around the same time, Freeland was elevated to city manager. Through his counsel, Briley protested his termination and asserted it was "clearly further retaliation against [him] for his reporting of safety concerns and filing of grievances." In December 2015, Briley initiated an administrative appeal to the City's HR Commission.

Under the City's municipal code, eligible employees who have suffered certain adverse employment actions may appeal to the commission. (West Covina Mun. Code, § 2-254.) The City's personnel rules provide that the HR Commission must grant the employee an evidentiary hearing "to determine the accuracy and sufficiency of the facts attendant to the disciplinary action imposed." After the hearing, the HR Commission must deliver its findings and recommendations to relevant City officials and to the employee. (West Covina Mun. Code, § 2-257.) "The official from whose action the appeal was made shall then review such findings and recommendations with the city manager[,]

8

and upon approval of the city manager, shall then affirm, revoke or modify the original action taken." (*Ibid.*) The parties agree that in the case of Briley's administrative appeal, the ultimate decisionmakers following the HR Commission's review would have been Whithorn, as the original decisionmaker, and Freeland, as the city manager.

The HR Commission scheduled hearings on Briley's appeal for May 2016. However, in April 2016, Briley's counsel notified the commission that Briley would not be proceeding with his appeal because doing so would be futile.[2] Among other complaints, counsel asserted there had been inordinate delays in the process and claimed the commission had no jurisdiction over Briley's claims of retaliation. Counsel also claimed it would be futile to proceed because Freeland, the ultimate decisionmaker in the appeal, had already found Briley's retaliation allegations unfounded, and because one attorney from the firm that served as West Covina's city attorney had advised Freeland in making that

---

[2] As discussed below, a party must generally exhaust available administrative review procedures before seeking the courts' intervention. (*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1080 (*Coachella Valley*).) However, the exhaustion doctrine is subject to several recognized exceptions, including the agency's lack of jurisdiction (*id.* at 1081-1082), futility based on the certainty of the agency's adverse ruling (*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1313), and the remedy's failure to satisfy due process (*Imagistics Internat., Inc. v. Department of General Services* (2007) 150 Cal.App.4th 581, 591 (*Imagistics*)).

determination, while another served as the commission's counsel.

### D. Briley's Complaint and the Trial Court's Ruling on the City's Lack of Exhaustion Defense

In August 2016, Briley filed this action against the City, asserting a single cause of action for retaliation in violation of Labor Code section 1102.5. Shortly before trial, the City moved for a separate trial under Code of Civil Procedure section 597, on its defense that Briley had failed to exhaust the City's administrative remedies.[3] In a trial brief on the issue, Briley argued he was not required to pursue an appeal to the HR Commission, contending, inter alia, that: (1) the procedure was inadequate because the commission lacked authority to consider his retaliation claims; (2) the procedure violated the requirements of due process because the ultimate decisionmakers, Whithorn and Freeland, were biased against Briley, and because the commission's counsel had a conflict of interest; and (3) for essentially the same reasons, pursuing the procedure would have been futile. The City argued in its brief that no exception to the exhaustion requirement applied.

---

[3] Code of Civil Procedure section 597 provides for the separate trial of any defense "not involving the merits of the plaintiff's cause of action but constituting a bar or ground of abatement to the prosecution thereof . . . ." (Code Civ. Proc., § 597.)

10

Following a hearing, the trial court concluded that Briley was excused from pursuing an appeal to the HR Commission. The court found that the procedure would have been futile because the ultimate decisionmakers, Whithorn and Freeland, had been personally embroiled in the dispute and had prejudged Briley's claims. It further found that the procedure did not provide an adequate remedy because the commission lacked authority to consider claims of retaliation. The matter proceeded to trial in October 2018.

*E. The Trial and the Jury's Verdict*

Numerous witnesses testified at trial, including Briley, Whithorn, Freeland, Larson, McKay, and Chung.[4] Briley generally sought to show (1) that his initial complaints against City officials were justified, (2) that the City had retaliated against him in various ways, including by initiating the investigation against him, (3) that the allegations against him were largely false, and ultimately, (4) that the City terminated him in retaliation for his complaints. The City, on the other hand, generally sought to show (1) that Briley had made false and frivolous allegations, in part to support a future claim of retaliation, (2) that he had been repeatedly rude and unprofessional with members of the public and repeatedly dishonest during

---

[4]    The trial court allotted each side 18 hours to question witnesses and make its case to the jury.

11

Larson's investigation, and (3) that the City had relied in good faith on Larson's findings in terminating Briley.

After trial, and following brief deliberations, the jury found for Briley on all issues. It awarded him over $500,000 in economic damages, $2 million in past noneconomic damages, and $1.5 million in future noneconomic damages. The City moved for a new trial, asserting, inter alia, that the jury's award was excessive, but the trial court denied this motion.

## DISCUSSION

A. *The Exhaustion Requirement and the Due Process Exception*

The City claims the trial court erred in concluding that Briley need not have exhausted his administrative appeal to the City's HR Commission. As explained below, we conclude Whithorn's expected role in deciding Briley's appeal violated the requirements of due process and therefore excused Briley from exhausting this remedy.[5]

---

[5] In their initial appellate briefs, the parties debated whether Briley was excused from exhausting his administrative appeal based on his claims that (1) bias by Freeland and Whithorn and a conflict of interest by the HR Commission's counsel rendered the procedure futile, and (2) that the HR Commission lacked jurisdiction to consider his claim of retaliation. With our permission, the League of California Cities and the California Special Districts Association filed a brief as amici curiae, also addressing the futility exception. At our invitation, the parties filed supplemental briefs addressing the
(*Fn. is continued on the next page.*)

12

1. *Principles*

We review the application of the exhaustion doctrine to undisputed facts de novo.  (*Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 873.)  Under this doctrine, a party must generally exhaust all available, nonduplicative administrative review procedures before resorting to the courts.  (*Coachella Valley*, *supra*, 35 Cal.4th at 1080.)  This requirement "is principally grounded on concerns favoring administrative autonomy (i.e., courts should not interfere with an agency determination until the agency has reached a final decision) and judicial efficiency (i.e., overworked courts should decline to intervene in an administrative dispute unless absolutely necessary)."  (*Ibid.*)

The exhaustion doctrine is subject to several recognized exceptions.  Under one such exception, the exhaustion requirement is excused if the relevant administrative remedy fails to satisfy the standards of due process.  (E.g., *Imagistics*, *supra*, 150 Cal.App.4th at 591; *Unnamed Physician v. Board of Trustees* (2001) 93 Cal.App.4th 607, 620.)  As relevant here, due process entitles a person seeking administrative review to "'a reasonably impartial, noninvolved reviewer.'"  (*Burrell v. City of Los Angeles* (1989) 209 Cal.App.3d 568, 581 (*Burrell*), quoting *Williams v. County of Los Angeles* (1978) 22 Cal.3d 731,

---

due process exception.  Given our conclusion that the due process exception applied due to Whithorn's expected role in the process, we need not discuss Briley's other claims and proffered exceptions, including his claims pertaining to bias by Freeland.

736-737; accord, *Nasha v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 483.)

"The standard of impartiality required at an administrative hearing is less exacting than that required in a judicial proceeding." (*Gai v. City of Selma* (1998) 68 Cal.App.4th 213, 219.) For instance, the right to a fair and impartial tribunal is not violated merely because the official who made the initial disciplinary decision has the final say in the administrative review process. (*Burrell, supra,* 209 Cal.App.3d at 579-580.) "It is also very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings." (*Withrow v. Larkin* (1975) 421 U.S. 35, 56.) But "various situations have been identified in which experience teaches that the probability of actual bias on the part of the . . . decisionmaker is too high to be constitutionally tolerable" (*Kloepfer v. Commission on Judicial Performance* (1989) 49 Cal.3d 826, 834 (*Kloepfer*)), including when the decisionmaker "has been the target of personal abuse . . . from the party before him [or her]" (*ibid.*), or "has become personally 'embroiled' in the controversy to be decided" (*Mennig v. City Council* (1978) 86 Cal.App.3d 341, 351 (*Mennig*), quoting *Taylor v. Hayes* (1974) 418 U.S. 488, 501-503).

14

2. *Analysis*

Whithorn's expected role in deciding Briley's administrative appeal presented an unacceptable risk of bias that excused Briley from exhausting this remedy, given both Whithorn's personal embroilment in the controversy and the significant animosity between Whithorn and Briley stemming from the same controversy. Briley initially accused Whithorn of failing to perform his professional duties. He then complained that Whithorn had retaliated against him for these initial allegations by cancelling his overtime, moving him to a smaller office, and changing his take-home vehicle. Briley also filed grievances asserting the same claims of retaliation and alleging that Whithorn had engaged in additional retaliation by giving him a poor performance review.

Unsurprisingly, Whithorn did not appreciate Briley's allegations against him. He testified at his deposition that their working relationship had become "strained," that Briley had undermined his authority by bringing "trumped up charges," and that Briley had tried to intimidate him. Whithorn was among those who informed Freeland of complaints against Briley, leading to the investigation against Briley, and he was the one who later issued Briley the notice of intent to terminate. After Whithorn initiated Briley's termination, Briley protested that this was simply further retaliation.

Briley's series of attacks against Whithorn's integrity would have been enough to raise concerns about Whithorn's

15

ability to be impartial in reviewing *any* claim by Briley. (See *Kloepfer*, *supra*, 49 Cal.3d at 834; *Tincher v. Piasecki* (7th Cir. 1975) 520 F.2d 851, 855 ["as a matter of fundamental due process, it is inherently improper for a person who has been charged by an accused in a collateral proceeding to participate as a committee member in the accused member's disciplinary hearing"]; cf. *Hicks v. Watonga* (10th Cir. 1991) 942 F.2d 737, 740-742, 751 (*Hicks*) [in action against city councilmember who had voted to uphold plaintiff's dismissal, genuine issue existed whether councilmember was biased at time of vote because plaintiff had previously filed grievance against her and repeatedly criticized her].) Of course, the claim Whithorn would have been called to consider in reviewing Briley's appeal was not just any claim, but a claim that Whithorn himself had retaliated against Briley in initiating his termination. Relevant to this claim would have been Briley's prior allegations that Whithorn had retaliated against him and had failed to do his job. Whithorn's own integrity would have been front and center in Briley's appeal, all but compelling him to defend his character (and possibly his career). (See *Mennig*, *supra*, 86 Cal.App.3d at 351 [where police chief had accused city councilmembers of misconduct, was dismissed by city council, and received reinstatement recommendation from civil service commission on administrative appeal, councilmembers were too personally embroiled in controversy to be permitted to overturn commission's decision; councilmembers were "impelled to seek

16

vindication"].) Given that Whithorn had been among those who had triggered the investigation against Briley, had been repeatedly accused of misconduct and retaliation by Briley, and had initiated Briley's termination -- the allegedly retaliatory decision he was to review -- he could hardly be seen as a reasonably impartial decisionmaker in Briley's appeal. (See *Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 223 [""'[n]o man is allowed to be a judge in his own cause; because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity'"""].)

Under the City's municipal code, Whithorn was to review the HR commission's findings and recommendations "with the city manager," and upon the city manager's approval, was to "affirm, revoke or modify" his own decision to terminate Briley. (West Covina Mun. Code, § 2-257.) This procedure would have given Whithorn a key role in deciding Briley's appeal, thus failing to satisfy the standards of due process and excusing Briley from exhausting this remedy. (See *Imagistics*, *supra*, 150 Cal.App.4th at 591; *Burrell*, *supra*, 209 Cal.App.3d at 581.)

In arguing that Whithorn's role as a decisionmaker did not violate due process, the City asserts, "The decision was not Whithorn's, alone, but was subject to both the independent evaluation of the Commission after a thorough hearing, as well as the City Manager's independent approval." We are not persuaded. Initially, the City's statement is inaccurate. Whithorn's decision was not

17

"subject to" the HR Commission's evaluation. Rather the commission was to deliver findings and recommendations that, with Freeland's approval, Whithorn would have been free to reject. Moreover, while any action by Whithorn would have been subject to Freeland's approval, the City's municipal code provided for a collaborative process, in which Whithorn and Freeland were to review together the HR Commission's conclusions. Under these circumstances, one biased decisionmaker was one too many. (See, e.g., *Woody's Group, Inc. v. City of Newport Beach* (2015) 233 Cal.App.4th 1012, 1022-1023 ["allowing a biased decision maker to participate in the decision is enough to invalidate the decision"]; *Stivers v. Pierce* (9th Cir. 1995) 71 F.3d 732, 747 [single panel member's bias tainted entire panel despite unanimous vote; "on a small board . . . a single person's bias is likely to have a profound impact on the decisionmaking process"]; *Hicks, supra,* 942 F.2d at 748 [single councilmember's bias sufficient to taint entire council; "'"Litigants are entitled to an impartial tribunal whether it consists of one [person] or twenty[,] and there is no way which we know of whereby the influence of one upon the others can be quantitatively measured"'"].)

We do not hold that any prior conflict between an employee and a superior will disqualify the latter from serving as a decisionmaker in the employee's administrative proceeding. Nor do we hold that a decisionmaker must be completely insulated from any matter relevant to the proceeding to be reasonably impartial. In most cases, an

18

employee will be required to pursue an available administrative remedy, notwithstanding some level of adverse interactions with the ultimate decisionmakers or prior involvement by them. We hold only that as a matter of due process, an official whose prior dealings with the employee have created substantial animosity and whose own conduct and character are central to the proceeding may not serve as a decisionmaker. Under the totality of the circumstances here, we conclude Briley was excused from exhausting the City's administrative appeal procedure.[6]

---

[6] For the first time on appeal, the City argues that Briley was required to: (1) raise the issue of Whithorn's bias before the HR Commission; and (2) challenge the City's termination decision in a petition for a writ of mandate. The City's failure to raise these contentions before the trial court constitutes forfeiture. (See *People v. Clark* (2016) 63 Cal.4th 522, 584 [argument raised for first time on appeal is forfeited].)

The City contends it did not forfeit these arguments because "being 'jurisdictional,' exhaustion 'can be addressed "at any point in the proceedings . . . ."'" It is mistaken. Under the weight of authority, the exhaustion doctrine does not implicate the court's subject matter jurisdiction, and its application may be forfeited. (See, e.g., *Green v. City of Oceanside* (1987) 194 Cal.App.3d 212, 222 [our Supreme Court "ma[de] it abundantly clear that the exhaustion doctrine does not implicate subject matter jurisdiction"; "It is 'jurisdictional' only in the sense that a court's failure to apply the rule in a situation where the issue has been properly raised can be corrected by the issuance of a writ of prohibition"]; *Kim v. Konad USA Distribution, Inc.* (2014) 226 Cal.App.4th 1336, 1347 ["'[T]he administrative exhaustion requirement does not implicate the court's subject matter jurisdiction'"]; *Planning & Conservation League v. Castaic Lake* (*Fn. is continued on the next page.*)

19

B. *Evidentiary Challenges*

The City challenges multiple evidentiary rulings by the trial court. We review the court's evidentiary rulings for abuse of discretion. (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.) "Specifically, we will not disturb the trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*Ibid.*) A miscarriage of justice results only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

---

*Water Agency* (2009) 180 Cal.App.4th 210, 251 [failure to exhaust administrative remedies is generally forfeited unless timely raised]; see also Asimow et al., Cal. Practice Guide: Administrative Law (The Rutter Group 2021) ¶ 15:125 ["the emerging majority view" appears to be that exhaustion doctrine may be forfeited].)

Moreover, the rule requiring a mandate proceeding as a prerequisite to an action for damages, where applicable, is not a matter of administrative exhaustion but "a form of res judicata, of giving collateral estoppel effect to the administrative agency's decision." (*Briggs v. City of Rolling Hills Estates* (1995) 40 Cal.App.4th 637, 646.) "Res judicata is not a jurisdictional defense, and may be waived by failure to raise it in the trial court." (*David v. Hermann* (2005) 129 Cal.App.4th 672, 683.)

20

1. *The Exclusion of Larson's Report and Her*
*Testimony About the Statements of Others*
a. *Background*

At trial, Larson testified about her investigation of the allegations against Briley, including the nature of the allegations, the witnesses she had interviewed in connection with each incident, and the general basis for the findings she had communicated to the City, which were unfavorable to Briley. For instance, in relation to the Victoria's Secret incident, she testified that Briley had been accused of speaking unprofessionally with a fire captain and using profanity in addressing a local worker. Larson stated she had concluded Briley's denial of the allegations was untruthful, and explained her conclusion was based on statements from Briley and five others who were present, noting that four of the others provided consistent versions and supported the allegations.

During Larson's testimony, the City's counsel attempted to introduce into evidence the 157-page report she had submitted to the City, summarizing the statements of witnesses she had interviewed and detailing her conclusions. Briley's counsel objected on hearsay grounds, and the trial court sustained the objection.

The City's counsel later sought to admit the executive summary portion of Larson's report, arguing outside the jury's presence that it was admissible to show the City had a legitimate reason to terminate Briley, regardless of the truth of the matters included in the report. The court disagreed,

suggesting that legitimate reasons existed only if the statements relayed by the report were true. The court further stated that a limiting instruction to the jury not to consider the report for the truth of the matters asserted "would be perfunctory," as the jury would not be able to "separate this out."

When the City's counsel asked Larson what various witnesses had told her during her investigation, Briley's counsel again objected on hearsay grounds, and the court similarly sustained the objection. Outside the presence of the jury, the court stated that its concerns regarding the relevant statements were "two-fold": first, the statements could justify Briley's termination only if they were true, meaning they would be relevant only for hearsay purposes; and second, it would be very hard for the jury to distinguish between relying on the statements for the truth of the matters asserted and relying on them only to establish that the investigation was conducted in good faith. However, the court allowed Larson to relay statements by Briley, as a party opponent, and certain other witnesses, either because they had testified at trial or because Briley's counsel did not object.

b. *Analysis*

The City contends the trial court abused its discretion in excluding Larson's report and her testimony about the statements she had gathered from other witnesses. It argues this evidence was admissible for the non-hearsay

22

purpose of establishing the City's state of mind as to Briley's termination, regardless of the truth of the excluded statements.  However, the City does not address the trial court's alternative ground for excluding the evidence:  that even with a limiting instruction, the jury would be unable to consider the evidence for purposes of establishing the City's state of mind while refraining from considering the statements for the truth of the matters asserted.  Because this ground was an independent basis supporting the court's ruling, the City's failure to discuss it forfeits its challenge to the ruling.  (See *Goncharov v. Uber Technologies, Inc.* (2018) 19 Cal.App.5th 1157, 1167, fn. 8 [issue not briefed is forfeited]; *Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125 [where trial court granted summary judgment against plaintiff on multiple independent grounds, plaintiff's failure to brief one of those grounds required affirmance].)

Moreover, the trial court's exclusion of the evidence based on the risk that it would confuse the jury was not an abuse of discretion.  Under Evidence Code section 352, trial courts have discretion to exclude relevant evidence upon concluding that its probative value is substantially outweighed by the probability that its admission will, among other things, create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.  (Evid. Code, § 352.)  As relevant here, even if evidence is otherwise admissible, "it is subject to exclusion under Evidence Code section 352 in the event the court determines that the

23

probative value of the evidence is outweighed by the risk that the jury will consider it for impermissible hearsay purposes." (*People v. Brown* (1994) 8 Cal.4th 746, 763.) The trial court made this determination with respect to Larson's report and her testimony about the statements she had obtained. Given that Larson was able to testify about the nature of the allegations she had investigated, the witnesses she had interviewed in connection with each incident, the basis for her findings, and in some cases the very statements she had relied on, nothing in the record suggests the court's determination was an abuse of discretion.[7]

---

[7] We observe that contrary to the trial court's conclusion, the contested evidence was otherwise admissible for the non-hearsay purpose of establishing that the City had terminated Briley for valid, non-retaliatory reasons, regardless of whether those reasons were correct. (See *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 358 [to constitute legitimate reasons for adverse action, employer's true reasons need not have been wise or correct].) Briley cites *People v. Sanchez* (2016) 63 Cal.4th 665 for its explanation that "[w]hen an expert relies on hearsay to provide case-specific facts, considers the statements as true, and relates them to the jury as a reliable basis for the expert's opinion, it cannot logically be asserted that the hearsay content is not offered for its truth." (*Id.* at 682.) This proposition is inapposite, as Larson offered no expert opinion regarding the truth of the allegations against Briley; instead, she testified about her investigation and the findings she had presented to the City, tending to show that the City had relied on her report in good faith.

2. *The Admission of McKay's Testimony about Her Conversation with Chung After Leaving the City*

a. *Background*

After McKay, the City's former HR director, left her position with the City, she was offered a position with another employer pending a background investigation. McKay then called Chung, the former city manager who had also left the City by that time, because the prospective employer wanted to speak with him about McKay.

At trial, Chung testified, without objection, that he had told McKay not to offer him as a reference because things did not end well between them. He stated he explained "the issues that [he] saw" to McKay. In response to questioning by Briley's counsel, Chung confirmed he had mentioned Briley's name to McKay and told her he had heard that after she left the City, she "came back as a witness for Briley . . . ." However, he denied telling McKay that he would give her a poor evaluation.

When McKay testified, Briley's counsel asked her about her conversation with Chung. The City objected on relevance grounds, but the trial court overruled the objection. The court noted that Chung had already testified about the conversation without objection and stated that Briley was entitled to impeach him. McKay then testified she had told Chung that her prospective employer wanted to speak with him and that she assumed he would give her a

25

good evaluation.  According to McKay, Chung replied, "No, you sided with Mr. Briley."

#### b.  *Analysis*

The City challenges the trial court's admission of McKay's testimony about her conversation with Chung, arguing this evidence was irrelevant and unduly prejudicial because both McKay and Chung were no longer city employees at the time.[8]  We disagree.

In determining the credibility of a witness, a jury may consider "any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing," including "[t]he existence or nonexistence of a bias, interest, or other motive."  (Evid. Code, § 780.)  According to McKay's testimony, Chung had either refused to serve as a reference for her or said he would not provide a favorable evaluation because she had "sided with" Briley, thus revealing his hostility to Briley.  This evidence was thus relevant to establish Chung's bias against Briley.

McKay's testimony was not unduly prejudicial for purposes of Evidence Code section 352.  "The 'prejudice'

---

8       The City also suggests in a conclusory manner that McKay's testimony about her conversation with Chung constituted inadmissible hearsay.  (Appellants opening brief, 76-77 ["neither were City employees at the time, so no hearsay exception would apply"].)  The City's failure to develop the argument forfeits the issue on appeal.  (See *Sviridov v. City of San Diego* (2017) 14 Cal.App.5th 514, 521 (*Sviridov*) [failure to present reasoned argument constitutes forfeiture].)

26

referred to in Evidence Code section 352 is 'evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues.'" (*People v. Cole* (2004) 33 Cal.4th 1158, 1197.) Chung's statement regarding Briley during his conversation with McKay was by no means inflammatory, especially given that the jury had already heard Chung testify, without objection, that he had noted McKay's support for Briley in refusing to serve as her reference. (See *People v. Karis* (1988) 46 Cal.3d 612, 638; *People v. Roberts* (1992) 2 Cal.4th 271, 305 [where jury had already properly heard similar evidence, prejudice from contested evidence was "slight"].) The trial court did not abuse its discretion in allowing McKay's testimony.

> 3. *The Admission of Testimony About the Lack of Disciplinary Action Against Briley's Co-Worker*
>      a. *Background*

As noted, one of the allegations against Briley was that he used profanity in addressing individuals at a CrossFit gym. When interviewed by Larson, both Briley and Shari Miller, a co-worker who was also present, denied that Briley had used profanity. Larson concluded that both were lying and reported this conclusion to the City.

At trial, Whithorn testified he was more concerned about Briley being untruthful than about his use of profanity and his unprofessional conduct. On cross-examination, Briley's counsel asked Whithorn if Miller had been

27

disciplined for lying about the CrossFit incident. The City objected, arguing the inquiry would be unduly prejudicial. However, the trial court overruled the objection, and Whithorn testified that Miller had not been disciplined for lying. On re-direct, Whithorn explained that he had not punished Miller because he did not believe her misstatements were malicious or made with the intent to deceive.

b. *Analysis*

The City claims the trial court abused its discretion in allowing Whithorn's testimony that Miller had not been disciplined. It argues the court erred in failing to inquire about the degree of similarity between Briley's and Miller's circumstances and that Whithorn's testimony was unduly prejudicial. We disagree.

Whithorn testified that he was more concerned about Briley's lack of candor than about his use of profanity and his unprofessional conduct. His failure to discipline Miller, who had allegedly lied about the same CrossFit incident Briley had allegedly lied about, tended to show that Whithorn was not genuinely concerned about Briley's dishonesty but instead used the CrossFit incident as pretext to terminate Briley. (See *Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 816 [employer's disparate treatment of plaintiff tends to prove pretext].) Nothing required the trial court to conduct a searching assessment of the similarity of the two employees' circumstances before

28

allowing the contested testimony.  The two cases the City cites are inapposite.  In one, the court held that without a showing of sufficient similarity, evidence of other bad acts was "nothing more than run-of-the mill propensity evidence, which should have never been presented to the jury." (*Pinter-Brown v. Regents of University of California* (2020) 48 Cal.App.5th 55, 98.)  Whithorn's testimony did not concern other bad acts or propensity.  In the other case the City cites, the Court of Appeal reversed the trial court's *exclusion* of evidence of other bad acts.  (See *Andrews v. City and County of San Francisco* (1988) 205 Cal.App.3d 938, 947.)

The City suggests the contested testimony was unduly prejudicial because the time limits the trial court had imposed on each side prevented it from eliciting testimony about the differences between Briley's and Miller's circumstances.  The record belies this contention, as the City did elicit Whithorn's explanation for not punishing Miller, viz., that he did not think Miller's misstatements were malicious or made with the intent to deceive.  Moreover, no significant amount of time would have been required for the City to ask Whithorn such questions as whether Miller had lied on multiple occasions and had been rude to members of the public, similar to the allegations against Briley.  Finally, the City cites no authority, and we are aware of none, holding that evidence may be excluded simply because its opponent has run out of time to contend with it to the opponent's satisfaction.  In short, the trial court did not

29

abuse its discretion in allowing Whithorn's testimony regarding the lack of disciplinary action against Miller.

4. *The Exclusion of Evidence Regarding Briley's Subsequent Termination by the City of Murrieta*

a. *Background*

Several months after the City terminated Briley's employment, he was hired by the City of Murrieta as a fire marshal, where he remained for about 10 months until his employment was terminated. However, after Briley initiated administrative proceedings challenging his termination, the City of Murrieta agreed that his separation from employment would be classified as a resignation, and that the surrounding circumstances would not be disclosed to others.

Before trial, Briley moved to exclude evidence of the circumstances surrounding his separation from the City of Murrieta, arguing, among other things, that this evidence constituted inadmissible character evidence under Evidence Code section 1101, subdivision (a). In opposing Briley's motion, the City represented to the trial court that Murrieta had terminated Briley because he had (1) improperly obtained and shared another employee's confidential personnel form, (2) engaged in "inappropriate behavior in front of a school board superintendent," and (3) told another employee that he was going to "gut" a third employee with whom he disagreed on a certain matter. The City argued the

30

evidence was admissible to prove that Briley had a propensity to steal files and to retaliate against other employees. The trial court disagreed and granted Briley's motion to exclude the evidence. At trial, the parties stipulated that Briley had resigned from the City of Murrieta and that his resignation was unrelated to his termination from the City of West Covina.

### b. *Analysis*

The City claims the trial court abused its discretion in excluding evidence of the circumstances surrounding Briley's departure from the City of Murrieta. It argues, conclusorily, that this evidence was admissible as probative of habit under Evidence Code section 1105: "For instance, Briley had engaged in verbally abusive behavior at Murrieta that could support a habit or custom of doing so with businesses while employed by West Covina (cursing or intimidating)." The City's perfunctory assertion is insufficient to raise a challenge on appeal. (See *Sviridov*, *supra*, 14 Cal.App.5th at 521.) Moreover, the City forfeited any contention that Briley's verbally abusive behavior constituted a habit by failing to raise it before the trial court, instead arguing only that Briley had the propensity to steal personnel forms and retaliate against other employees. (See *Perez v. Grajales* (2008) 169 Cal.App.4th 580, 591-592 ["arguments raised for the first time on appeal are generally deemed forfeited"].)

Finally, were we to consider the merits of the City's challenge, we would reject it. Evidence Code section 1101,

31

subdivision (a), prohibits admission of evidence of a person's character, including in the form of specific instances of his or her misconduct, to prove the person's conduct on a specified occasion. (Evid. Code, § 1101, subd. (a).) However, under Evidence Code section 1105, "[a]ny otherwise admissible evidence of habit or custom is admissible to prove conduct on a specified occasion in conformity with the habit or custom." (*Ibid.*) "[A] habit involves a consistent, semiautomatic response to a repeated situation." (*Bowen v. Ryan* (2008) 163 Cal.App.4th 916, 926.) The City's offer of proof -- that Briley had been "inappropriate" in front of a school board superintendent and told another employee that he would "gut" a third employee because he disagreed with her -- lacked any specifics that could allow a factfinder to conclude that Briley's conduct constituted a semiautomatic response to a repeated situation. Accordingly, we find no abuse of discretion by the trial court.[9]

C. *The Noneconomic Damages Awards*

The City does not challenge the jury's award of $500,000 in economic damages. However, it challenges the jury's total award of $3.5 million in noneconomic damages -- $2 million in past and $1.5 million in future noneconomic damages -- claiming that it was excessive and that the trial

---

[9]     The City contends the cumulative effect of the trial court's evidentiary errors warrants reversal. Because we have found no erroneous ruling, there is no cumulative effect that may have prejudiced the City.

32

court abused its discretion in denying its motion for a new trial on this ground. As discussed below, we agree that the jury's awards were grossly disproportionate to the evidence and cannot stand.

### 1. *Background*

At trial, Briley testified about his noneconomic damages. He claimed that his termination had caused him "distress" and that the ordeal was "tough" because his livelihood was taken away and because he had been dedicated to the City for eight years. In response to questioning about any physical symptoms resulting from his termination, he stated his termination was "upsetting," and later confirmed that he had "issues with [his] sleep" because of the financial uncertainty he was experiencing at the time. He suggested that at the time of his termination, he was supporting his romantic partner's children, aged 17 and 19. Briley testified his termination was "pretty devastating," as he had been in fire service since he was 16 years old. When asked to describe how he felt as a result of his termination, he replied, "It's just difficult," stating that the City's process was unfair and that some of the allegations against him were blatant lies, while others could have been worked through if he had been notified of any concerns. According to Briley, he continued to think about his termination almost every day, and it still impacted his sleep and almost all aspects of his life.

On cross-examination, Briley confirmed he had experienced "the gamut of emotions" anyone would experience upon being terminated. He further revealed that he had seen a counselor once or twice, but reported no mental health issues. The City's counsel noted that Briley had obtained a position as a fire marshal with the City of Murrieta subsequent to his termination and asked Briley if his decision to leave this position after about 10 months is what truly bothered him. In response, Briley admitted he had "walked away" from this fire-service position, but claimed that what bothered him were West Covina's false allegations against him.

In closing argument, after arguing extensively about the liability issues, Briley's counsel asked the jury to award him $1.5 million for past noneconomic damages and $1.5 million for future noneconomic damages. In the City's closing argument, counsel for the City mentioned the word "incredulity," said that he had had to look it up in the dictionary, and explained its meaning to the jury. In Briley's rebuttal, his counsel accused the City's counsel of lying to the jury about having had to look up the word: "That was a false statement that [the City's counsel] made. . . . He knows exactly what it meant, but he told you he had to look it up in the dictionary. [¶] This is part of the game, part of the smoke and mirrors. Hey, I'm a normal guy, I had to look it up in the dictionary. . . . He's probably used it 20 times and

he knew exactly what it meant. . . . That's all part of the smoke and mirrors of this case."[10]

After brief deliberations, the jury returned a verdict for Briley and awarded him over $500,000 in economic damages, $2 million in past noneconomic damages, and $1.5 million in future noneconomic damages. The City moved for a new trial, arguing, inter alia, that the award was excessive and the result of prejudice, bias, or passion. At a hearing on its motion, the City suggested that Briley's counsel's attack on its counsel's character during closing argument prejudiced the jury against it. The trial court denied the City's motion for a new trial, stating that the jury's award was "a bit over the top" and that the court would not have awarded that amount, but that the jury was entitled to do so.

### 2. *Principles*

"'The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. They see and hear the witnesses and frequently . . . see the injury and the impairment that has resulted therefrom. As a result, all presumptions are in favor of the decision of the trial court [citation]. The power of the appellate court differs

---

[10] After both parties delivered their arguments, counsel for the City objected to Briley's counsel's assertion that he had lied to the jury, and asked for a mistrial. The trial court denied the motion, noting that no contemporaneous objection had been made.

materially from that of the trial court in passing on this question.  An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury.'" (*Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 299 (*Bigler-Engler*).)

"'[I]n a case where it appears that a verdict is so grossly disproportionate to any reasonable limit of compensation warranted by the facts as to shock the sense of justice and raise at once a strong presumption that it is based on prejudice or passion rather than sober judgment [citations] the appellate court may reverse the judgment and remand the case for a new trial either on all the issues or on the issue of damages alone [citations], or it may, in the interests of justice and with the consent of the party against whom the modification is made, modify the judgment as to the amount of damages, and affirm it as modified [citations].'" (*Buell-Wilson v. Ford Motor Co.* (2006) 141 Cal.App.4th 525, 548 (*Buell-Wilson*), judg. vacated on other grounds *sub nom*. *Ford Motor Co. v. Buell-Wilson* (2007) 550 U.S. 931.)

"In reviewing a noneconomic damage award[,] '[t]here are no fixed or absolute standards by which an appellate court can measure in monetary terms the extent of the damages suffered by a plaintiff as a result of the wrongful act of the defendant.'" (*Buell-Wilson, supra,* 141 Cal.App.4th at 547-548.)  "'While the appellate court should consider the

36

amounts awarded in prior cases for similar injuries, obviously, each case must be decided on its own facts and circumstances.'" (*Id.* at 548.) In addition to the amount of the award and its relation to the evidence, the court may consider indications in the record that the factfinder was influenced by improper considerations, such as inflammatory evidence, misleading jury instructions, or improper argument by counsel. (*Bigler-Engler*, *supra*, 7 Cal.App.5th at 299.)

### 3. *Analysis*

We agree with the City that the jury's total award of $3.5 million in noneconomic damages is shockingly disproportionate to the evidence of Briley's harm and cannot stand. Initially, the $2 million award in past noneconomic damages -- covering a period of about three years between Briley's termination and the trial -- had no relation to the evidence. Briley testified his termination was "pretty devastating" and caused him distress because his livelihood had been taken away, because he had been dedicated to the City for eight years, and because he had spent his entire career in fire service. He stated that he thought about his termination almost every day and that the ordeal impacted almost every aspect of his life. When asked, however, Briley offered little detail regarding the distress he had experienced or the impact his termination had on his life. He noted only having sleep-related "issues" associated with financial uncertainty, prior worries about his ability to provide for the

37

17- and 19-year-old children of his romantic partner at the time of his termination, and feeling wronged by the City's unfair process and the false allegations against him.

There was no evidence that any of the problems Briley described was particularly severe. He described no physical symptoms beyond his unspecified sleep-related issues. He had seen a counselor once or twice but reported no mental health issues. On cross-examination, Briley confirmed he had experienced the gamut of emotions anyone would experience upon his or her termination from employment.

A discriminatory or retaliatory termination is undoubtedly upsetting and warrants reasonable compensation for any accompanying emotional distress. (See, e.g., *Sargent v. Board of Trustees of California State University* (2021) 61 Cal.App.5th 658, 661, 666, fn. 4 [$116,000 noneconomic damages award for retaliation claims]; *Mathews v. Happy Valley Conference Center, Inc.* (2019) 43 Cal.App.5th 236, 247 [$275,000 noneconomic damages award for retaliatory termination claims];; *Roberts v. Ford Aero. & Communications Corp.* (1990) 224 Cal.App.3d 793, 797 [$100,000 noneconomic damages award for "severe emotional distress" caused in part by racially motivated termination].) But without evidence of significant, concrete harm, the typical post-termination difficulties described by Briley cannot support an award of $2 million for past noneconomic damages covering a period of about three years, amounting to more than $1,700 per day, including the roughly 10 months during which Briley

worked for the City of Murrieta.  (Cf. *Colucci v. T-Mobile USA, Inc.* (2020) 48 Cal.App.5th 442, 449, 461 [award of $500,000 in past noneconomic damages for retaliatory termination, covering period between July 2014 termination and 2017 trial; following termination, plaintiff gained up to 100 pounds, became depressed and lethargic, and suffered from stomach problems, sleeplessness, and rashes]; *Hope v. California Youth Authority* (2005) 134 Cal.App.4th 577, 584-585 [total award of $1 million in noneconomic damages for harassment and retaliation where plaintiff suffered anxiety so severe that it caused him to develop bleeding blister in retina of his right eye, leading to permanent loss of vision].)  Indeed, not even Briley's counsel suggested such an excessive amount was appropriate.

Briley points to his emotional demeanor on the witness stand, which the court's comments confirmed.[11]  But while a jury may consider a plaintiff's demeanor in assessing his or her noneconomic damages, demeanor alone is no substitute for testimony or other evidence of harm.  (See *Scala v. Moore McCormack Lines, Inc.* (2d Cir. 1993) 985 F.2d 680, 684 ["While a jury has broad discretion in measuring damages, it "'may not abandon analysis for sympathy""].)  Giving outsized weight to the plaintiff's demeanor may in fact reflect that the award is the result of passion rather than measured judgment.

---

[11]    Outside the presence of the jury, the court noted Briley had cried during his testimony.

39

The $1.5 million future noneconomic damages award stands on even shakier ground. By the time of the jury's verdict, many of the issues Briley identified in his testimony were substantially resolved or significantly diminished. The half a million dollars in economic damages Briley stood to receive should have eliminated any remaining financial concerns tied to his termination from the City, and his testimony did not suggest that he continued to provide for any dependents. The jury's favorable and sizable verdict also vindicated Briley and counteracted any false or unfair allegations against him. (Cf. *Weller v. ABC* (1991) 232 Cal.App.3d 991, 1013 [plaintiff experienced sorrow because his mother died before jury verdict vindicated him].)

In his respondent's brief, Briley asserts the City took away his life's dream to work in fire service. Yet Briley admitted at trial that he had "walked away" from a fire marshal position with the City of Murrieta and pointed instead to the City's false allegations as the cause of his emotional distress, negating the suggestion that the City was responsible for the loss of his career in fire services. Under these circumstances, and given the absence of any evidence of significant lasting harm, a $1.5 million award for future noneconomic damages is no less than shocking.

Briley's counsel's attack on the integrity of opposing counsel during his rebuttal argument further suggests that the jury's noneconomic damages award rested on improper

40

factors.[12] (See *Bigler-Engler*, *supra*, 7 Cal.App.5th at 304 [plaintiff's counsel's overheated rhetoric in closing argument, including analogizing opposing counsel's argument to rapist saying that the victim "'liked it,'" contributed to award of excessive damages].) Without any foundation, Briley's counsel accused the City's counsel of lying to the jury about having had to look up the meaning of the word "incredulity," and suggested that the City's counsel had similarly attempted to deceive the jury about the case: "That was a false statement that [the City's counsel] made. . . . He knows exactly what it meant, but he told you he had to look it up in the dictionary. [¶] This is part of the game, part of the smoke and mirrors. Hey, I'm a normal guy, I had to look it up in the dictionary. . . . He's probably used it 20 times and he knew exactly what it meant. . . . That's all part of the smoke and mirrors of this case." This personal attack on the City's counsel, shortly before the jury began its deliberations, may have prejudiced the jury against the City and contributed to its excessive award, which went beyond even Briley's counsel's exorbitant request.

---

[12] We have no occasion to decide whether Briley's counsel's ad hominem attack on opposing counsel constituted misconduct, although it reflected a lack of civility. What is important for purposes of the damages award is the statements' effect on the jury, not attribution of fault. (Cf. *Buell-Wilson*, *supra*, 141 Cal.App.4th at 554 [defendant's counsel's inflammatory question might have explained jury's excessive award].)

Based on our review of the record, and in our collective experience, the jury could have awarded Briley no more than $1 million for past noneconomic damages, reflecting the distress, financial uncertainty, and sleep-related issues he experienced in the aftermath of his termination. We further conclude the jury could have awarded no more than $100,000 for Briley's future noneconomic damages, reflecting the largely diminished effects of his termination in the wake of the jury's verdict. While these amounts remain high in relation to the evidence of Briley's harm, we may not insert our own assessment for that of the jury; instead, we ask only what amount the jury could reasonably have awarded. (See *Bigler-Engler*, *supra*, 7 Cal.App.5th at 299.) Accordingly, we vacate the past and future noneconomic damages awards and remand for a new trial on those issues, unless Briley accepts a reduction of the awards to $1 million and $100,000, respectively. (See *id.*, at 306.)

## DISPOSITION

The awards for past and future noneconomic damages are vacated, and the matter is remanded for a new trial on those issues, unless Briley consents to their reduction to $1 million and $100,000, respectively.  If he agrees to this reduction, Briley must file his written consent with the clerk of this court and serve it on the City within 30 days of this opinion, in which case the trial court shall conduct any further necessary and appropriate proceedings and enter judgment consistent with this opinion.  In all other respects, the judgment is affirmed.  Each party shall bear its own costs on appeal.

**CERTIFIED FOR PUBLICATION**

MANELLA, P. J.

We concur:

COLLINS, J.

CURREY, J.

43