Filed 1/15/25  Dini v. Dickinson CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| SANDY DINI,<br><br>  Plaintiff and Appellant,<br><br>v.<br><br>DAVID DICKINSON,<br><br>  Defendant and Respondent. | H051147<br>(Santa Cruz County<br> Super. Ct. No. 21PR00218) |

Olean "Sunny" Fleshman, the surviving settlor of a testamentary trust, disinherited her daughter, plaintiff Sandy Dini, by a third amendment to the trust.[1]  After Olean died, Sandy challenged this amendment as procured by the undue influence of David Dickinson, Olean's brother-in-law, and executed when Olean lacked testamentary capacity.  Sandy also sued David for intentional interference with Sandy's expected inheritance.  It was Sandy's burden to prove her claims at trial, but the trial court, ruling under Code of Civil Procedure section 631.8, found that she did not meet her burden.[2]

---

[1] Because each party and various principals share surnames with other witnesses or principals, we will use their first names in subsequent references.  We mean no disrespect in doing so.  (See *In re Marriage of Leonard* (2004) 119 Cal.App.4th 546, 550, fn. 2.)

[2] " ' "The purpose of Code of Civil Procedure section 631.8 is to enable a trial court which, after weighing the evidence at the close of the plaintiff's case, is persuaded

On appeal, Sandy bears the further burden of showing that the evidence compels a finding in her favor as a matter of law. (See *Almanor Lakeside Villas Owners Assn. v. Carson* (2016) 246 Cal.App.4th 761, 769 (*Almanor*).) She has not done so, nor has she demonstrated that the trial court's statement of decision otherwise reflects prejudicial errors. We accordingly affirm the judgment.

## I. BACKGROUND

### A. *Sandy's Petition*

Olean and her husband Charles E. Fleshman settled the 2012 Fleshman Family Trust and executed pour-over wills. Originally, the trust appointed Sandy as co-trustee and on the settlors' death would leave Sandy a manufactured home, so long as it was still part of the trust estate. The trust provided nothing to David or his wife, Patti Dickinson (Olean's sister). Over the years, Sandy's beneficial interest in the trust increased to a third of the estate (despite her removal as a co-trustee), dwindled to $5,000 in a February 2016 amendment, then Olean finally disinherited Sandy in August 2016 (Charles died in April 2016). In contrast, David and Patti were originally strangers to the trust, but David, along with Patti, became a co-trustee and beneficiary, with his interest in the trust increasing to about 23 percent, or about 46 percent if only he but not Patti survived Olean.

After Olean's death, Sandy filed a petition "to restore her one-third interest" in the trust estate, under the original trust together with Olean's codicil of either September or August 2015, by which Olean exercised her power to leave one-third of the estate to Sandy. Sandy sought to invalidate amendments that were unfavorable to her: (1) the September 2015 first trust amendment, on the ground that Charles lacked capacity to execute it; (2) the February 2016 second trust amendment and related codicils on the

that the plaintiff has failed to sustain his burden of proof, to dispense with the need for the defendant to produce evidence." ' " (*Roth v. Parker* (1997) 57 Cal.App.4th 542, 549.) Undesignated statutory references are to the Code of Civil Procedure.

grounds that (a) Charles lacked testamentary capacity, and (b) David procured them by fraud, undue influence, and elder abuse; and (3) the August 2016 third trust amendment, on the grounds that (a) Olean lacked authority to amend the disposition of the disclaimer trust after Charles's death, and (b) it was a product of David's fraud and undue influence. Sandy also alleged that David was civilly liable for intentional interference with an expectancy interest (IIEI) by procuring the February 2016 and August 2016 amendments.

**B.** *The Trial Evidence*

Olean and Charles were married for more than 40 years. Sandy and her sister Kimberly Coronel were Olean's children from a previous marriage.

In 2012, Olean and Charles purchased a manufactured home and moved to Aptos to be closer to Sandy and her husband Mark Dini. Then in their 80's, Olean and Charles, formed the 2012 Fleshman Family Trust with the assistance of attorney Timothy J. Morgan in Santa Cruz. Olean and Charles contemporaneously executed separate pour-over wills.

Under the original trust, Sandy would receive the manufactured home in Aptos, but the gift would lapse if the mobile home was no longer part of the trust estate. Kimberly, Sandy's son Nicholas Dini, and Charles's granddaughter Rachel Lee would each receive $50,000 cash gifts. Seven other relatives were given smaller cash gifts. The trust granted the surviving settlor a general power of appointment to direct disposition of trust assets by will expressly stating an intention to exercise the power of appointment.

Sandy and Mark testified that they often socialized with and cared for Olean and Charles after the move to Aptos. But in 2015, Olean and Charles relocated to Aegis, an assisted living facility in Aptos.

In May 2015, Olean executed a codicil to her will exercising her power of appointment under the trust. Under the codicil, Sandy (or Mark, if he but not Sandy survived Olean) would receive either the manufactured home or its value as of its sale. The codicil retained gifts of $50,000 each for Kimberly, Nicholas, and Rachel. The

3

codicil provided gifts of $5,000 or $10,000 to three other family members. The residue was to be split evenly between Kimberly and Rachel.

For a few years, Sandy and Mark used money from bank accounts belonging to Olean, Charles, and the trust. According to Sandy and Mark, their withdrawals were authorized for legitimate purposes: (1) a salary Olean offered Sandy for her time and care; (2) payments made shopping for Olean and Charles; and (3) monetary gifts to Kimberly, which were often made using cash withdrawn from Olean's account. But Sandy and Mark did not keep records reflecting their withdrawals or their reasons for making them.

The withdrawals surfaced after David was asked to investigate whether money was missing from the trust accounts. In July 2015, Patti sent Olean an e-mail with instructions to obtain her bank records and provide them to David, a certified public accountant, for review. David reviewed Olean's bank records and found that funds had been transferred directly from bank accounts to Sandy's account.

Although David did not dispute that Olean may have authorized Sandy to take " 'some' money once in a while," Olean told David that she had not approved a salary or regular allowance for Sandy. Between the bank records and Olean's information, David concluded that Sandy and Mark were misappropriating funds.

On August 4, 2015, representing that Charles was incapacitated, Olean signed a document exercising her authority to remove Sandy and Mark as co-trustees and appoint David and Patti as co-trustees instead.

The next day, David, Olean, and Patti confronted Sandy and Mark. David accused Sandy and Mark of misappropriating Olean's money. Sandy disclosed her stage 4 cancer diagnosis to Olean, but Olean was convinced Sandy had stolen from her and angrily dismissed Sandy's medical disclosure as "no excuse."

From that point, Sandy testified, "I don't think she ever quite looked at me the same anymore."

4

From then on, David and Patti managed the Fleshmans' finances. And when there were changes to be made to the estate documents, David communicated those directions to Morgan. Morgan, however, always personally confirmed with Olean any changes to be drafted.

On August 14, David e-mailed Morgan inquiring about a codicil "that was drawn up last week in" Morgan's meeting with Olean. David expected Sandy to be disinherited "unless [Olean] changed her mind." Morgan replied the same day that he would draft a codicil disinheriting Sandy and that Olean would sign it at his office.

But the codicil Olean executed three days later exercised Olean's power of appointment to leave Sandy the "first one-third" of the estate. The codicil introduced a percentage-based allocation system, with Rachel, Nicholas, Kimberly, Patti, and David to each take approximately 16 percent of the remaining two-thirds of the estate (or around 11 percent of the total estate), although either Patti or David would see their share double if the other did not survive Olean.

Shortly after Olean executed the August codicil, Morgan contacted David to ask whether Charles might want to amend the trust to track Olean's most recent codicil. David reported to Morgan that Sandy appeared to have misappropriated over $60,000 and that Olean "was beyond furious and shocked" and wanted to leave Sandy "only $5,000, not the $300,000" represented by a third of the estate. But in September, Olean and Charles amended their trust, adopting the same allocation as was in Olean's August 2015 codicil.

In August, Olean sent Sandy conciliatory e-mails expressing her gratitude for the care Sandy and Mark had provided, her continued love for Sandy and Mark, and her hope that mutual forgiveness and reconciliation could someday occur. Olean in a November 2015 e-mail lamented that Sandy was refusing her calls.

Sandy replied to Olean's November overture upbraiding her mother for "what [Olean] did to" Sandy and Mark, when it was Sandy and Mark who had grown the

5

Fleshmans' assets. Rejecting Olean's "incessant" prayers for Sandy's welfare, Sandy closed by suggesting "God . . . probably thinks you should pray for forgiveness for being self-centered, cruel[,] and phony. You should . . . start thinking about what really went on for the 3 years you lived here [and] what your life would have been without us."

In January 2016, David again contacted Morgan about changes to the trust. In an e-mail to Morgan, copying Olean, he wrote that they had at last disclosed "the misappropriation of the money taken by Sandy and Mark" to Charles. David added that Olean was "very upset and disappointed" with Sandy's son, Nicholas, and "since they have already given him close to [$50,000] over the last few years . . . would like to remove [him] from receiving any further distribution from the Trust." David provided their direction to split Nicholas's share between Rachel, Patti, and David. David attached a document that showed Sandy's share cut to $5,000, with further handwritten annotations deleting Nicholas's interest and reallocating it between Rachel, Patti, and David. Olean then left Morgan's office a voicemail confirming of what David had told Morgan, "That's . . . my wishes . . . exactly."

The second trust amendment, as executed, provided $5,000 to Sandy. The remainder of the trust estate was to be distributed on a percentage basis, with Rachel, Patti and David taking about 21.5 percent each (with David or Patti's share doubling to 43 percent if only one was still living), Kimberly taking about 16 percent, and six other family members taking about 3 percent each.

Nicholas acknowledged that he had received separate monetary gifts to help him buy a car, a house, and start a business. He also confirmed that given the rift between Sandy and Olean, he had not seen Olean for "all of 2016, more or less" until May 2017, when there was "a warming up period" before they "started talking like . . . family again." Nicholas apologized to Olean for his "lapse" of contact; Olean did not "want to talk about . . . the tension, any of it" but reaffirmed her love for Sandy and Mark.

Charles died in April 2016.

In July 2016, David e-mailed Morgan, copying Olean, about a further amendment of the trust. David wrote that Olean felt that "Sandy is not going to be fair with Kim," given Sandy's efforts to renovate and sell a duplex "where Kim has lived rent free for 20 + years." David identified several requested changes to the trust: (1) removing the $5,000 gift to Sandy; (2) reducing the gift to Rachel to match the shares of "all of the other grandchildren"; (3) reassigning the difference to Kimberly; (4) omitting Robert Bryan, now deceased, but allocating $5,000 to his widow; and (5) reallocating what had been Robert's percentage to Patti and David.

In August 2016, Olean executed the third (and ultimately final) trust amendment, effecting these changes.

Olean died in December 2020.

## C. *The Section 631.8 Motion, Judgment, and Appeal*

After Sandy rested her case, the trial court granted David's section 631.8 motion. In concluding its oral ruling, the trial court remarked that "petitioner has simply failed to satisfy her burden of proof." The trial court prepared a written statement of decision, which it filed concurrently with the entry of judgment.[3] (There is no objection in the record to the statement of decision or to any proposed statement of decision.)

Sandy timely appealed.

## II. DISCUSSION

In the written statement of decision, the trial court found that Sandy failed to prove "that Charles or Olean were unduly influenced to execute any of the [relevant] documents . . . [or] that either of them were subjected to any persuasion, . . . that caused either of them to act or refrain from acting by overcoming their free will and resulted in

---

[3] Sandy did not include her request for a statement of decision in the record. We are accordingly unable to determine whether her request properly identified the principal controverted issues to be addressed. (Cal. Rules of Court, rule 3.1590(d); *Parris J. v. Christopher U.* (2023) 96 Cal.App.5th 108, 134.)

inequity." As to David's involvement, the court found "no evidence that . . . he unduly benefitted" from the trust amendments or "destroy[ed] Olean's or Charles's free agency and substitute[d] his will for their will, at any time."

As to Sandy's tort claim, the trial court determined, "Even if [Sandy] had standing . . . , the evidence shows that she is not entitled to any such relief." The court found no "evidence that proves to a reasonable degree of certainty that a bequest or devise to her would have been in effect at the time of Olean's death, nor that [David] engaged in wrongful conduct that interfered with that reasonable certainty, which conduct was wrong for some reason other than the fact of the alleged interference itself. Nor was there any evidence that [David] engaged in tortious conduct that induced or caused Olean or Charles to take some action that deprived [Sandy] of an inheritance."

Sandy's appeal at bottom disputes the sufficiency of evidence to support the trial court's determination that she failed to meet her burden of proof, which requires her to establish that the evidence compels findings in her favor. (*Almanor*, *supra*, 246 Cal.App.4th at p. 769.) Arguing for a more exacting standard of review, Sandy makes three primary contentions on appeal: (1) the trial court committed a legal error by failing to evaluate the presumption of undue influence; (2) the trial court committed a legal error by finding that she did not have standing to prosecute an IIEI claim; and (3) the trial court made what she calls " 'no evidence' findings" that are unsupported by substantial evidence. These contentions supply no basis for reversal.

A.      *Standard of Review*

At the end of a plaintiff's case-in-chief, a trial court is empowered " 'to weigh evidence and make findings' " in deciding whether the burden of proof has been met. (*Higgins v. Higgins* (2017) 11 Cal.App.5th 648, 658; § 631.8.) Where the issue on appeal arises "from a determination of failure of proof at trial, the question for the reviewing court is ' "whether the evidence compels a finding in favor of the appellant as a matter of law." ' [Citation.] Specifically, we must determine ' "whether the appellant's

8

evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " ' " (*Almanor*, *supra*, 246 Cal.App.4th at p. 769; see also *Higgins*, at p. 658 [explaining that substantial evidence standard of review applies to judgments given under § 631.8]; *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465–466 [applying substantial evidence standard to failure of proof at trial].)

## B.     *The Presumption of Undue Influence*

The right to dispose of one's property in death is a fundamental one, even if the particular exercise of that right might produce injudicious results.  (*Bilafer v. Bilafer* (2008) 161 Cal.App.4th 363, 370–371; *Estate of Sarabia* (1990) 221 Cal.App.3d 599, 604, superseded by statute on other grounds as stated in *Rice v. Clark* (2002) 28 Cal.4th 89, 97 (*Rice*).)  But a testamentary instrument is invalid if procured by the another's undue influence.  (See *Rice*, at p. 96; *David v. Hermann* (2005) 129 Cal.App.4th 672, 684 (*David*).)  "Undue influence is pressure brought to bear directly on the testamentary act, sufficient to overcome the testator's free will, amounting in effect to coercion destroying the testator's free agency."  (*Rice*, at p. 96.)

A challenger may raise a rebuttable presumption that a will or trust was the product of undue influence by showing that "(1) the person alleged to have exerted undue influence had a confidential relationship with the testator; (2) the person actively participated in procuring the instrument's preparation or execution; and (3) the person would benefit unduly by the testamentary instrument."  (*Rice*, *supra*, 28 Cal.4th at p. 97.)  The presumption "shifts to the proponent of the [testamentary instrument] the burden of producing proof by a preponderance of the evidence that the [instrument] was not procured by undue influence.  It is for the trier of fact to determine whether the presumption will apply and whether the burden of rebutting it has been satisfied."  (*Estate of Sarabia*, *supra*, 221 Cal.App.3d at p. 605; see also *David*, *supra*,

9

129 Cal.App.4th at p. 684 [explaining that challenger is not required to rely on presumption of undue influence, but may use it to shift the burden of proof].)

Whether "the beneficiary's profit is 'undue' " turns on "an appreciation of the respective relative standings of the beneficiary and the contestant to . . . determine which party would be the more obvious object of the decedent's testamentary disposition." (*Estate of Sarabia*, *supra*, 221 Cal.App.3d at p. 607.) The court may consider "dispositional provisions in previous wills executed by the decedent [citation], or past expressions of the decedent's testamentary intentions," or "the extent to which the proponent would benefit in the absence of the challenged will." (*Ibid*.)

### 1. *The Evidence Did Not Compel a Finding in Sandy's Favor*

The trial court determined that Sandy failed to prove undue influence and expressly found that she failed to prove two of the elements necessary to the common law presumption.[4] (See *Rice*, *supra*, 28 Cal.4th at pp. 96–97.) Because Sandy bore the burden of establishing the elements of the presumption of undue influence, the question on appeal is whether the trial evidence compelled a finding in her favor on each element. (See *Almanor*, *supra*, 246 Cal.App.4th at p. 769; see also *Gomez*, *supra*, 54 Cal.App.5th at p. 1027 [" ' " 'Where [a] statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision' " ' "].) But the trial evidence does not compel a finding that David's benefit under the challenged

---

[4] We reject Sandy's contention that the trial court's failure to expressly refer to the presumption of undue influence in making these findings constitutes reversible error. " ' "The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case." ' " (*Gomez v. Smith* (2020) 54 Cal.App.5th 1016, 1026–1027 (*Gomez*).) The trial court's express factual findings addressing two essential elements of the presumption of undue influence fairly disclose its decision not to apply the presumption in this case.

testamentary documents was undue. So the evidence did not compel the trial court to apply the presumption.[5]

To be sure, there is evidence from which the court could determine that David's benefit was undue,[6] but substantial evidence supports the contrary inference. Sandy's interest was highest during and immediately after the time she and her husband were caring for Olean and Charles. But when Olean around August 2015 concluded that Sandy had stolen from her, the relationship became strained and David and Patti assumed Sandy's and Mark's responsibilities. As David and Patti took on that role, they were added as beneficiaries. The court could thus properly find that David's benefit grew at the expense of other beneficiaries in proportion to David's increasing assistance to Olean—much as Sandy's had before the rift between mother and daughter.

There was also substantial evidence to support the trial court's determination that Sandy's disinheritance was her own doing. Despite the accusations, Sandy's gift was not substantially cut until after she unambiguously rebuffed Olean's efforts at reconciliation in November 2015. Nor did Sandy's gradual disinheritance inure exclusively to David and Patti's benefit: Olean increased Kimberly's benefit between the original trust and its final amendment. Sandy does not contend that Kimberly's increased share of the trust estate was a product of David's influence; indeed, in e-mails to Morgan, David disagreed with the extent of Olean's efforts during her lifetime to financially support Kimberly. Rather, the trial evidence supplied another explanation for Olean's decision to provide for

---

[5] Because Sandy was required to establish all three elements, we need not review the trial court's finding on the second element—active participation.

[6] Sandy argues that David's benefit was undue because (1) he was not a blood relative, but a relative by marriage to Olean's sister Patti; (2) he was much younger than Patti; (3) he was paid a trustee's fee for his work as a trustee; (4) his share (in combination with Patti's) increased quickly after he became involved in the trust affairs; and (5) his increasing shares coincided with reductions to the shares given to blood relatives.

11

Kimberly but not Sandy—there is evidence supporting a reasonable inference that Olean viewed Kimberly as dependent on Olean for financial support, whereas Mark's November 2015 e-mail reply to David's accusation emphasized that Mark's income was adequate to support his and Sandy's lifestyle.

The trial court could thus reasonably infer that Olean's decision to provide for David and Patti reflected her desire to be generous to those with whom she had closest social and caregiving relations when executing the documents; and her decision not to provide for Sandy reflected Sandy's termination of their relationship and ability to provide for herself.

Sandy appears to maintain that David's benefit is undue because it was by falsely disparaging Sandy that he secured his beneficial interest in the trust. But while the record is replete with disparagement, it does not compel a finding that David's accusations were *false*. Sandy agreed that she took money from Olean's bank account and did not maintain records that would corroborate her explanations or refute the accusation of theft. As she testified: "No, I did not [keep records and take notes], and that was very sloppy of me. . . . I should have, you know, taken . . . things down and kept [a] good record, but I had no idea that this was coming, that someone would accuse of me of stealing." We acknowledge that a trial court could reasonably have credited Sandy's explanation of her withdrawals and transfers, but our deferential review turns not on whether there is substantial evidence to support Sandy's justification for her use of trust assets, but on whether the trial court could infer that Sandy had failed to carry her burden of proving that David falsely accused her of misappropriation.[7]

_____

[7] If Sandy did not misappropriate trust funds, there may also be a question of whether David honestly but incorrectly believed that she had. Indeed, Sandy adduced testimony from David that he was not aware of legitimate reasons she might have had for withdrawing money from Olean's bank account, and e-mails from herself and Mark indicate that David revised his estimate of the amount of misappropriated money downward over time.

12

Simply, the record before us does not compel a finding that David was granted an undue benefit under any of the challenged instruments.

### 2.    " 'No Evidence' Findings"

Focusing on the phrasing of the trial court's written statement of decision, Sandy contends that she is nevertheless entitled to reversal because the trial court found "[t]here was no evidence" on the relevant essential elements even though there was some evidence that could support Sandy's theory.  This line of argument does not supply a basis for reversal.

Assuming the trial court's findings that there was "no evidence" on either element were incorrect, Sandy offers no authority suggesting that an incorrect factual finding inessential to the judgment justifies reversal.[8]  In other contexts, courts have instead disregarded the erroneous factual finding and proceeded with their review of the judgment based on the balance of the statement of decision.  (See *Valerio v. Andrew Youngquist Construction* (2002) 103 Cal.App.4th 1264, 1271 [" ' "When a trial is had by the Court without a jury, a fact admitted by the pleadings should be treated as 'found . . .' [and a finding adverse] to the admission . . . should be disregarded in determining . . . whether the proper conclusion of law was drawn from the facts found and admitted by the pleadings" ' "]; *Romer v. Wehner* (1923) 61 Cal.App. 411, 415; *Wilson v. Mattei* (1927) 84 Cal.App. 567, 573.)

---

[8] Sandy merely directs our attention to authority generally describing the applicable standard of review.  (See *Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 503 [upholding factual findings on substantial evidence review where the trial evidence was in conflict]; *Acosta v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 19, 27–28 [upholding jury's negligence finding where it was supported by substantial evidence]; *Ajaxo, Inc. v. E\*Trade Financial Corp.* (2020) 48 Cal.App.5th 129, 163–164 [explaining burden on appellant who failed to carry burden of proof in the trial court].)

Even if the statement of decision were ambiguous as to whether the trial court decided whether Sandy had shown David received an undue benefit, the record does not demonstrate that Sandy took the steps necessary in the trial court to avoid the doctrine of implied findings. (See *Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 983 (*Thompson*); *Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 494; §§ 632, 634.) To disable the doctrine, a party must " 'specify . . . controverted issues' or otherwise 'make proposals as to the content' of a statement of decision under section 632" and "object under section 634." (*Thompson*, at p. 983; *Ermoian*, at pp. 494, 500.) The only record we have of the trial court proceedings between its oral ruling on David's section 631.8 motion and its written statement of decision is the trial court's indication that it prepared the statement of decision at Sandy's request. Without at least the request, Sandy has not provided an adequate record to disable the doctrine of implied findings. (See *Jameson v. Desta* (2018) 5 Cal.5th 594, 609 [discussing appellant's burden of providing an adequate record].) There is also no indication that Sandy fulfilled her obligation to bring any ambiguity to the trial court's attention under section 634.[9] (See § 634 [requiring ambiguity in statement of decision to be brought to the trial court's attention "either prior to entry of judgment or in conjunction with a motion under [§] 657 or 663"].)

Sandy suggests that the trial court's "dismissive" findings reflect that it failed to consider the evidence before it. But the trial court's lengthy explanation of its oral ruling on David's section 631.8 motion and its written statement of decision reflect that it duly weighed the trial evidence. Ultimately, the court was not persuaded that David unduly

---

[9] It is unclear whether the trial court provided the proposed statement of decision California Rules of Court, rule 3.1590(a) requires before filing its final statement of decision and entering judgment. But even if this irregularity prevented Sandy from raising concerns before judgment, it did not foreclose her compliance with section 634 by filing a new trial motion under section 657.

14

influenced Olean or Charles or that the evidence justified any presumption of undue influence.

## C. *Tortious Interference with Expected Inheritance*

In *Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039, 1057, the court identified five elements to an IIEI claim: (1) the plaintiff's expectancy of an inheritance; (2) the defendant's knowledge of the plaintiff's expectancy and deliberate action to interfere with it; (3) the interference must be independently tortious—wrong beyond the fact of the interference—and directed at someone other than the plaintiff; (4) causation to a reasonable degree of certainty that the bequest would have been in effect at the time of the settlor's death if there had been no interference; and (5) damage by the interference. "In other words, the defendant's tortious conduct must have induced or caused the [settlor] to take some action that deprives the plaintiff of [her] expected inheritance." (*Id.* at p. 1058.) Sandy challenges the trial court's determination on the merits and its alternative determination that she lacked standing.

### 1. *The Evidence Did Not Compel a Finding in Sandy's Favor*

Because Sandy bore the burden of proving intentional interference with an expectancy interest, the question on appeal is whether the trial evidence compelled a finding in her favor on each element. (See *Almanor*, *supra*, 246 Cal.App.4th at p. 769.) As with her trust contest, the evidence does not meet this high threshold.

Sandy maintains that David interfered with her expectancy by telling Olean that Sandy was stealing from her. As we have explained, the evidence supports the inference that David told Olean Sandy was stealing, that Olean believed him, and that this opened the rift that then widened with Sandy's angry message of November 2015. But notwithstanding Sandy's explanation of her use of Olean's money, we cannot hold that

15

the record *compels* the conclusion that David's accusation was mistaken, let alone false.[10] Rather, a factfinder could well have concluded from David's testimony and Sandy's inability to document her explanations that David merely reviewed Olean's bank statements at her request and confirmed that Sandy took money from Olean that could not be accounted for. The trial court could thus find that Sandy had failed to carry her burden of proof.

Here too, Sandy disputes as an unsupported factual finding the trial court's statement that she did not present " 'any evidence' " establishing that David engaged in tortious conduct depriving her of an inheritance. Sandy argues that she is entitled to reversal because there was some evidence that would if credited support a contrary finding. Although she admits that "[i]f the trial court had . . . found this evidence unconvincing, there would be some basis for [its] conclusion," she does not account for the trial court's finding that she failed to carry her burden of proof. The trial court's IIEI findings collectively reflect that it found Sandy's evidence unconvincing. The findings on these issues reflect the absence of evidence sufficient to "prove[]" or "show" the asserted fact to the factfinder's satisfaction. As with the trial court's finding that there was "no evidence" establishing a presumption of undue influence, we do not read the trial court's statement that there was not "any evidence that [David] engaged in tortious conduct" to supply a basis for reversal.[11]

---

[10] In her reply brief, Sandy argues that it was improper for David to mention "misappropriation of funds" in his appellate briefing because the fact of misappropriation is "disputed." But the misappropriation issue is central to Sandy's challenge to the trial court's IIEI ruling. At the same time, she argues that the trial court was obliged to consider that David admitted "making slanderous comments," but concedes that whether she misappropriated funds is disputed and that her contrary evidence is limited to her own testimony. (Cf. Civ. Code, § 46.)

[11] Sandy points to her evidence relating to: (1) Charles's and Olean's testamentary capacity; (2) whether (absent the presumption) David unduly influenced Charles or Olean; (3) whether David engaged in financial elder abuse; and (4) whether David misled

16

## 2. *The Trial Court's Alternative Ruling on Standing*

Sandy disputes the trial court's conclusion that she lacked standing to prosecute an IIEI claim.[12] Because the trial court's finding that Sandy failed to prove her IIEI claim independently supports the judgment, we do not address this contention. (See generally *Thompson*, *supra*, 6 Cal.App.5th at p. 983 [failure to make finding on a particular matter specified in request for statement of decision despite objection is harmless if the judgment is otherwise supported and a finding in favor of the appellant would not contravene other findings].) We note the record belies Sandy's assertion that the standing ruling "prevented her from prosecuting her IIEI claim." The trial court did not rule on standing until after Sandy had rested her case, and it did so in a ruling that also rejected her tort claim on the merits.

## III. DISPOSITION

The judgment is affirmed.

---

or defrauded Charles or Olean. Relying on the potential overbreadth of the trial court's phrasing, Sandy has demonstrated neither that the trial record compelled a different result as to any of these disputed facts nor that a different result could have impacted the judgment. Notably, Sandy did not dispute David's assertion that only Olean's testamentary capacity is relevant on appeal because Sandy cannot obtain any benefit if the third trust amendment, executed after Charles's death, is valid.

[12] In making this argument, Sandy cited a nonpublished opinion in both her opening and reply briefs. We remind counsel this violates California Rules of Court, rule 8.1115.

_____
LIE, Acting P. J.

WE CONCUR:

_____
WILSON, J.

_____
BROMBERG, J.

*Dini v. Dickinson*
H051147